**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATHAN, *et al.***,<br><br>Plaintiffs,<br><br>v.<br><br>**DONALD J. TRUMP, *et al.***,<br><br>Defendants. | Case No. 26-cv-3377 (CRC) |

**MEMORANDUM OPINION**

Children born in the United States and subject to its jurisdiction are American citizens from birth. That rule, enshrined in the Fourteenth Amendment's Citizenship Clause and codified in the Immigration and Nationality Act, derives from the English common law and is deeply rooted in our legal tradition. Save for the brief period between the Supreme Court's execrable Dred Scott decision in 1857 and the ratification of the Fourteenth Amendment eleven years later, it has prevailed in this country since the Founding.

Earlier this year, the Supreme Court struck down President Trump's Executive Order 14160, which purported to deny citizenship to children born to parents temporarily or unlawfully present in the country. Those children, like "nearly all children born in the United States," the Court explained, are "citizens at birth" because they are born "subject to American law." Trump v. Barbara, 609 U.S. 719, 734–37, 740–41 (2026). Barbara reaffirmed that birthright citizenship extends to all but three narrow categories of children, each long understood to be beyond the Nation's governing authority at birth: children of foreign officials enjoying full diplomatic immunity, children of enemy forces in hostile occupation of U.S. territory, and children born aboard foreign public ships.

Yet Barbara's ink had scarcely dried when the President issued a second executive order—Executive Order 14418, at issue here—directing federal agencies to withhold recognition of citizenship from additional categories of U.S.-born children with noncitizen parents. Among those now targeted are children whose parents work for foreign governments or international organizations but lack diplomatic immunity, children born through commercial surrogacy arrangements, and children with a parent suspected of membership in certain gangs or terrorist organizations.

As the Supreme Court has made clear, however, the President cannot carve out new exceptions to birthright citizenship for children born within the United States and subject to its laws. The Court will therefore certify a class consisting of children who are or will be unlawfully denied citizenship under the Order. And it will preliminarily enjoin the Government from enforcing the Order against members of that class.

## I. Background

### A. Birthright Citizenship

The story of American birthright citizenship begins, as so many American legal stories do, in English common law. There, the ancient principle of *jus soli*—citizenship based on birth within a country's territory—was well established.[1] The rule arose from the reciprocal obligations of protection and obedience: The king owed a duty of protection to all those within his territory, while they, in return, owed him allegiance and obedience to his laws. Nearly all those "born within the dominions of the crown of England," including "the children of aliens,"

---

[1] *Jus sanguinis*, in contrast, grants citizenship by descent or blood and is the default rule in most civil law European countries. See Tuaua v. United States, 788 F.3d 300, 308–09 (D.C. Cir. 2015).

entered that symbiotic relationship at birth and thus became the king's "[n]atural-born subjects." 1 W. Blackstone, Commentaries on the Laws of England 354, 361 (1765).

The common law recognized three narrow exceptions to *jus soli* where the mutual ties of allegiance, obedience, and protection were severed at birth. *First*, children born to foreign diplomats on English soil were not natural-born subjects. Under the legal fiction of extraterritoriality, these children were treated as owing allegiance to the foreign sovereign their parents served, rather than the English crown, and were generally exempt from obeying English law. See Calvin's Case, 77 Eng. Rep. 377, 399, 7 Co. Rep. 1a, 18a–18b (K.B. 1608); Emerich de Vattel, The Law of Nations, or, Principles of the Law of Nature, Applied to the Conduct and Affairs of Nations and Sovereigns 497 (London, G.G. & J. Robinson 1797) (1758). *Second*, children born to invading soldiers in occupied territory were not subjects at birth because the king's authority and protection did not extend to lands beyond his control. See Calvin's Case, 77 Eng. Rep. at 399; Thomas Egerton, The Speech of the Lord Chancellor of England, in the Exchequer Chamber, Touching the Post-Nati 62–69, 89 (London, Societie of Stationers 1609) (Lord Ellesmere's opinion in Calvin's Case). *Third*, children born on a foreign public ship in English waters were also excluded, as the foreign sovereign—rather than the king—continued to exercise jurisdiction over the vessel. See Vattel 102–103; Hugo Grotius, The Rights of War and Peace 167 (London, W. Innys & R. Manby 1738) (1625).

*Jus soli* permeated the king's realm, so it accompanied the colonists to the New World. Before the Revolution, "all persons born within the colonies of North America, whilst subject to the crown of Great Britain, were natural born British subjects." Inglis v. Trs. of Sailor's Snug Harbor, 28 U.S. (3 Pet.) 99, 120 (1830). After the colonies gained independence, former "subject[s] of the king" became "citizen[s]" of the States. State v. Manuel, 20 N.C. (3 & 4 Dev.

& Bat.) 144, 152 (1838). Yet all the states continued to embrace the common law rule. See 2 James Kent, Commentaries on American Law 38–39, 38 n.a (New York, William Kent 6th ed. 1848) (1827). So just as all persons "born within the dominions of the crown of England" were "[n]atural-born subjects," 1 Blackstone 354, "all persons born within the jurisdiction of the United States" were "natural[-]born citizen[s]," Lynch v. Clarke, 1 Sand. Ch. 583, 668–69 (N.Y. Ch. 1844) (citations omitted).

"In a Nation of immigrants—an 'asylum for mankind,' in Thomas Paine's words—*jus soli*'s broad scope took on particular importance." Barbara, 609 U.S. at 730 (quoting Thomas Paine, Common Sense (1776), in 1 Writings of Thomas Paine 67, 101 (Moncure Daniel Conway ed., New York, G.P. Putnam's Sons 1894)). The only children who did not receive birthright citizenship were those who, despite being born within U.S. territory, were seen as largely exempt from the application or enforcement of U.S. law. This group included the same discrete categories recognized under the English rule: children of diplomats and children born to members of invading foreign armies. See 2 Kent 38–42; Inglis, 28 U.S. at 155–56, 164–67 (opinion of Story, J.); Horace Binney, Alienigenae of the United States 16–17, 20 (Phila., C. Sherman 2d ed. 1853). American common law also crafted a new exception for children born into Indian tribes, who were viewed as members of distinct political communities and were generally exempt from American law. See Goodell v. Jackson ex dem. Smith, 20 Johns. 693, 712 (N.Y. 1823) (C. Kent) (concluding "Indians are considered as born under the dominion of their tribes," not "within the purview of [U.S. or state] law"). Apart from those limited jurisdiction-based exceptions, however, all children born on U.S. soil were citizens at birth. See Keith E. Whittington, By Birth Alone: The Original Meaning of Birthright Citizenship and Subject to the Jurisdiction of the United States, 49 Harv. J.L. & Pub. Pol'y 459, 467–69 (2026).

In 1857, the Supreme Court departed sharply from that well-entrenched common-law rule. In the infamous case of Dred Scott v. Sandford, the Court subordinated birthplace to bloodline and held that descendants of slaves born in America were "not included, and were not intended to be included, under the word 'citizens' in the Constitution." 60 U.S. (19 How.) 393, 404 (1857).

Although Dred Scott had "overruled the common law," the American "people—eventually—would overrule the Court." Barbara, 609 U.S. at 733. After the Civil War, the States ratified the Fourteenth Amendment, including its Citizenship Clause, which provides that "[a]ll persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The Clause's "central purpose was, of course, to overrule Dred Scott and confirm U.S. citizenship for the recently freed slaves and other Americans of African ancestry." Michael D. Ramsey, Originalism and Birthright Citizenship, 109 Geo. L.J. 405, 472 (2020). But it also sought—and indeed was understood at the time of adoption—to mirror and reinstate the centuries-old common law rule that had been temporarily eclipsed.

The Clause's chief architect described the Clause as "simply declaratory of . . . the law of the land already." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (Sen. Howard). The Clause's sole qualifier— "subject to the jurisdiction thereof"—echoed the common law's way of describing birthright citizenship. See Lynch, 1 Sand. Ch. at 668 (explaining that "all persons born within the jurisdiction of the United States" are citizens); 2 Kent 38 & n.a (similar). And the plain meaning of this phrase in 1868 was simply that a person could be governed directly by America's laws—mapping neatly onto *jus soli*'s near-universal coverage and handful of narrow exceptions. See Noah Webster, A Dictionary of the English Language 732 (Springfield, G. & C.

Merriam 1865) (defining "jurisdiction" as "the power or right of exercising authority"). The other branches likewise understood that the Clause simply restored "the rule of the common law" that had briefly been displaced by Dred Scott. McKay v. Campbell, 16 F. Cas. 161, 165 (D. Or. 1871) (No. 8,840); see Memorandum from H. Fish, Sec'y of State, to Mr. Marsh (May 19, 1871), in 2 A Digest of the International Law of the United States 394 (F. Wharton ed., Wash., Gov't Printing Off. 2d ed. 1887) (describing the Citizenship Clause as "simply an affirmance of the common law of England and of this country"). So did our common-law contemporaries across the pond. See Alexander Cockburn, Nationality 12 (London, William Ridgway 1869) ("The law of the United States agrees with our own.").

Three decades after its ratification, the Supreme Court confirmed this widespread understanding of the Citizenship Clause in its seminal birthright citizenship case, United States v. Wong Kim Ark, 169 U.S. 649 (1898). "The real object" of the Clause, "in qualifying the words 'all persons born in the United States' by the addition 'and subject to the jurisdiction thereof,'" the Court explained, was to exclude from birthright citizenship the same groups recognized by the common law as "not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction" of the sovereign. Id. at 655, 682. Those groups included: (1) "children of foreign sovereigns or their ministers," (2) children "born on foreign public ships," (3) children "of enemies within and during a hostile occupation of part of our territory," and (4) "children of members of the Indian tribes." Id. at 693. As for all other U.S.-born children, the "ancient and fundamental rule of citizenship by birth within the territory" applied. Id.

In 1940, Congress wrote the language of the Citizenship Clause, essentially unchanged, into the U.S. Code. See Nationality Act of 1940, ch. 876, § 201, 54 Stat. 1137, 1138 (providing

that any "person born in the United States, and subject to the jurisdiction thereof" is a "citizen[] of the United States at birth"). Congress believed it merely codified "the common-law rule, which has been in effect in the United States from the beginning of its existence as a sovereign state," and the scope of which "was discussed . . . in . . . Wong Kim Ark." 76th Cong. 418 (Comm. Print. 1940); see also Doe v. Trump, 157 F.4th 36, 61–62 (1st Cir. 2025) (making the same observation), cert. denied, 146 S. Ct. 2810 (2026). Congress recodified the statutory right to birthright citizenship, verbatim, when it enacted the Immigration and Nationality Act ("INA") in 1952. See Pub. L. No. 82-414, § 301(a)(1), 66 Stat. 163, 235 (codified at 8 U.S.C. § 1401(a)). That Congress, too, thought it was simply affirming Wong Kim Ark's birthright citizenship rule. See S. Rep. No. 82-1137, at 38 (1952); H.R. Rep. No. 82-1365, at 25, 76 (1952).

"[F]rom the time of those statutory enactments in 1940 and 1952 all the way through 2025, the Executive Branch consistently interpreted § 1401(a) to encompass only those Wong Kim Ark exceptions to birthright citizenship." Barbara, 609 U.S. at 719 (Kavanaugh, J., concurring in the judgment and dissenting in part). And it continued to interpret the Citizenship Clause in lockstep. See Legis. Denying Citizenship at Birth to Certain Child. Born in the United States, 19 Op. O.L.C. 340, 341–42 (1995) ("The unmistakable purpose of [the Citizenship Clause] was to constitutionalize the existing Anglo-American common law rule of jus soli [and its] . . . . extremely limited exceptions.").

B. Executive Order No. 14160

The Executive Branch broke with that longstanding understanding last year. On Inauguration Day, President Trump issued Executive Order No. 14160, titled "Protecting the Meaning and Value of American Citizenship." 90 Fed. Reg. 8449 (Jan. 29, 2025) ("EO1"). It proclaimed that children born on American soil to mothers unlawfully or temporarily present and

fathers who were neither U.S. citizens nor lawful permanent residents were not "subject to the jurisdiction" of the United States—and thus were not citizens at birth. Id.

Lawsuits challenging EO1 ensued across the country. Lower federal courts swiftly and universally concluded that the executive order violated the Citizenship Clause and the INA. Two cases warrant discussion. In Barbara v. Trump, the District of New Hampshire certified a class of all children affected by EO1 and preliminarily enjoined its enforcement as to that class. 790 F. Supp. 3d 80, 91, 105–06 (D.N.H. 2025). Within the same month, another court preliminarily enjoined enforcement of EO1 against an identical class of children. See CASA, Inc. v. Trump ("CASA I"), 793 F. Supp. 3d 687, 702 (D. Md. 2025); CASA, Inc. v. Trump ("CASA II"), 793 F. Supp. 3d 703, 728–29 (D. Md. 2025).

The Supreme Court granted certiorari before judgment in the New Hampshire case. See Trump v. Barbara, 146 S. Ct. 879 (2025). To defend EO1, the Administration advanced a novel interpretation of what it means to be born "subject to the jurisdiction" of the United States. It argued that the Citizenship Clause and INA cover only those who are born "completely subject" to the Nation's "political jurisdiction" and who therefore owe "direct and immediate allegiance" to the United States from birth. See Brief of Petitioners at 2–3, Barbara, 609 U.S. 719 (No. 25-365) (citation omitted). For children of noncitizens, according to the Government, such allegiance turns on their parents' "domicile" at the time of birth. Id. at 2 (citation omitted). Under this revisionist reading, U.S.-born children of noncitizens acquire birthright citizenship only if their parents had first established lawful, permanent domicile in the United States. See id. at 14–21, 30.

The Supreme Court rejected that interpretation and affirmed the preliminary injunction of EO1. "The Citizenship Clause incorporated the common law" rule of *jus soli*, the Court

explained, "with its broad reach and narrow exceptions." Barbara, 609 U.S. at 737, 741. And it "uses jurisdiction in its ordinary sense—referring to the power of the United States to govern those within its territory." Id. at 736. The Fourteenth Amendment—like the common law before it—thus guarantees citizenship to "all children born in the United States and subject to its power." Id. at 741. Consequently, "children born of parents unlawfully or temporarily present in the United States," like "nearly all children born" in this country, are "citizens at birth." Id. at 737, 741.

Barbara unequivocally embraced "Wong Kim Ark in its entirety" and "reaffirmed the consensus understanding of birthright citizenship in the strongest terms." Amanda Frost & Rachel E. Rosenbloom, Trump v. Barbara and the Future of Birthright Citizenship, 138 Harv. L. Rev. 137, 157–58 (2026). It was, in other words, "a ringing endorsement of near-universal birthright citizenship." Id. at 159. Still, Barbara left several questions unanswered: Are the four common-law exceptions recognized in Wong Kim Ark exhaustive, or does the Constitution permit new exceptions? What is the scope of those historical exceptions in modern times? And does the INA's citizenship right merely mirror the Fourteenth Amendment's citizenship guarantee, or does it afford broader protection?

C. Executive Order No. 14418

On August 6, 2026, the President issued Executive Order No. 14418, titled "Continuing to Protect the Meaning and Value of American Citizenship." 91 Fed. Reg. 51991 (Aug. 6, 2026) ("EO2"). EO2 purports to "identif[y], non-exhaustively, and prescribe[] action concerning certain categories of children of aliens who," according to the President, "do not fall within the rule of birthright citizenship as announced by the Supreme Court" in Barbara. EO2 § 1. It

directs federal agencies not to recognize the citizenship of people with no U.S.-citizen parent who fall within one of four broadly defined categories. Id. § 2.

*First*, it denies citizenship to anyone whose parent "is an alien enemy," which is "defined to include any member of a designated Foreign Terrorist Organization" ("FTO") or a "Specially Designated Global Terrorist" ("SDGT") group. Id. § 2(a). These designations span thousands of entities, including well known organizations like Al-Qaeda and MS-13. See 8 U.S.C. § 1189; 50 U.S.C. § 1701; Exec. Order No. 13224, 3 C.F.R. 786 (2002).[2]

*Second*, it withholds recognition of citizenship for anyone whose parent "is a foreign government employee," which includes "(i) ambassadors; (ii) persons employed by a foreign embassy or consulate who are nationals of that foreign country; (iii) persons employed by a foreign government in an official capacity; and (iv) persons employed by an international organization that possess international-organization immunity." EO2 § 2(b)(i)-(iv). As for the last subcategory, dozens of international organizations possess international-organization immunity, including the International Monetary Fund, United Nations, and World Health Organization. See 22 U.S.C. § 288; 8 C.F.R. § 316.20(c) (2025).

*Third*, children of parents who "engaged in fraudulent activity" or "a commercial transaction to purchase or access birthright citizenship" are likewise refused citizenship. EO2 § 2(c). This includes contractual arrangements with U.S.-based surrogates and so-called "birth tourism." See id. § 2(c)(i)-(ii); Opp'n at 2. "Birth tourism" is a practice by which foreign

---

[2] See U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations [https://perma.cc/NF6N-QXCL] (last visited Nov. 24, 2026) (listing 101 organizations); U.S. Dep't of State, Executive Order 13224, https://www.state.gov/executive-order-13224 [https://perma.cc/X9GU-YLBJ] (last visited Oct. 19, 2026) (listing 436 organizations); Off. of Foreign Assets Control, Sanctions List Search, https://sanctionssearch.ofac.treas.gov (last visited October 19, 2026) (searching for all SDGTs "return[s] too many results," and SDGTs in China, Mexico, Pakistan, and Syria alone total 603).

mothers travel to America solely to give birth and obtain citizenship for their children. See Senate Comm. on Homeland Sec. & Governmental Affs., Report on Birth Tourism in the United States: Minority Staff Report, at ii (2022), https://perma.cc/7EA3-5EWZ. "[B]irth tourism companies" reportedly collect hefty fees to facilitate such travel. Id. at 25–26. That practice defies U.S. law, under which "obtaining U.S. citizenship for a child" is an impermissible basis for a tourist visa. 22 C.F.R. § 41.31(b)(2)(i) (2023).

*Fourth*, children "born in a territory or territorial waters of the United States where citizenship is not conferred by Federal statute" are also denied citizenship. EO2 § (2)(d). Federal law, in turn, provides citizenship to children born on "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands," 8 U.S.C. § 1101(a)(38), so long as they are "subject to the jurisdiction" of the United States, of course, 8 U.S.C. § 1401(a). This exception thus covers children born in American Samoa or on a foreign public ship in U.S. waters. See Tuaua, 788 F.3d at 305–06; Nov. 12 Hr'g Tr. ("Hr'g Tr.") 36:18–19.

The President directed the Secretary of State, the Secretary of Homeland Security, the Commissioner of the Social Security Administration (collectively, "Agency Defendants"), and the Attorney General to "take all appropriate measures" to implement EO2 and instructed all agency heads to "issue public guidance within 30 days of the date of th[e] order regarding th[e] order's implementation with respect to their operations and activities." EO2 § 3(a)–(b). Many agencies issued guidance related to their programs on September 4, 2026—all of which describes EO2 as "prospective only." Opp'n at 5 & n.1 (collecting guidance documents); FAC ¶¶ 50–62 (same).

The Social Security Administration ("SSA") guidance, for instance, clarified that "a birth certificate showing a U.S. place of birth will not be sufficient documentary evidence of United States citizenship for persons covered by the EO" and the agency would "require additional evidence" before issuing Social Security Numbers. Soc. Sec. Admin., Guidance on Continuing to Protect the Meaning and Value of American Citizenship (Executive Order 14418) for the Social Security Administration 2 [hereinafter SSA Guidance], https://perma.cc/DU9M-U4BV. Where SSA cannot verify one parent is a U.S. citizen, it will engage in a process "to determine whether either parent" falls into a category described in EO2. Id. at 3. If, after this investigation, "the data do not indicate [an EO2] condition has been met," the agency will contact the parents to attest to their U.S. citizenship or answer under penalty of perjury "a series of questions to determine whether either parent meets any of the EO conditions." Id. at 4. If SSA still believes that an EO2 category applies, it will not issue the child a Social Security Number. See id.

The State Department implemented a similar procedure for passports. "If neither parent of a minor [passport] applicant is a U.S. citizen, an attestation from each parent, under penalty of perjury, must be submitted as part of the determination whether either parent meets any of the EO conditions." Dep't of State, Guidance on Executive Order 14418: Continuing to Protect the Meaning and Value of American Citizenship 3 [hereinafter DOS Guidance], https://perma.cc/A67M-XTMF. And "[a]ny misrepresentations made under penalty of perjury could subject the [parents] to legal liability, including potential federal criminal prosecution." Id.

The Department of Homeland Security ("DHS") also issued an interim final rule regarding EO2. See Registration of Lawful Permanent Residence for Children Born to Foreign Government Employees in the United States, 91 Fed. Reg. 57249 (Sept. 9, 2026) [hereinafter DHS IFR]. Previously, only U.S.-born children of "foreign diplomatic officer[s] accredited to

the United States" were excluded from birthright citizenship. 8 C.F.R. § 101.3(a) (2025). To conform with EO2, DHS amended that regulation to also exclude children of persons employed by "a foreign embassy or consulate who are nationals of that foreign country"; "a foreign government in an official capacity"; or "an international organization that possesses international-organization immunity." DHS IFR, 91 Fed. Reg. at 57251. The rule also warned that children denied citizenship under EO2 "may . . . be subject to removal from the United States." Id. at 57252.

A preliminary injunction currently bars the Government from enforcing EO2 against a class of children subject to EO1—*i.e.*, children who were born in the United States to parents who were temporarily or unlawfully present. CASA, Inc. v. Trump ("CASA III"), 838 F. Supp. 3d 498, 508–10, 524 (D. Md. 2026).

D. This Lawsuit

Plaintiffs are a collection of parents and children affected by EO2. They have brought a class action complaint for declaratory and injunctive relief against the President and Agency Defendants (collectively, "Defendants"). See FAC ¶¶ 14–25. They seek to represent a class of nearly all parents and children covered by EO2, a declaratory judgment that Defendants' policy of denying birthright citizenship is unlawful, and an injunction against that policy. Id. ¶¶ 63–64, 100–23.

Plaintiff "Clara" is a citizen of France who has lived in the United States for more than a decade. Id. ¶ 14. She gave birth to her child, Plaintiff "Nathan," in Washington, D.C., in August 2026—after the issuance of EO2. Id. "Neither Clara nor her husband, Nathan's father, is a U.S. citizen." Id. They are present in the United States on G-4 employment visas, as both work for international organizations that possess international-organization immunity and are listed in 8

C.F.R. § 316.20(c). Id. Due to the injunction against EO2 in CASA, Nathan has been issued a U.S. passport. Id.

Plaintiff "Edward" is an Australian citizen. Id. ¶ 15. He lives in Australia with his wife, a cardiologist with whom he operates clinics. Id. Edward and his wife—neither of whom are U.S. citizens—welcomed their second child, Plaintiff "Eleanor," through commercial surrogacy in the United States in October 2026. See id.; Decl. of Edward ¶¶ 16, 21, ECF No. 3-3. Eleanor also received a U.S. passport because of the CASA injunction. See FAC ¶ 15.

Plaintiff "Alexander" is a Swiss citizen. Id. ¶ 17. "He currently resides in Monaco with his wife, a Swedish citizen." Id. In October 2026, they welcomed their first child through commercial surrogacy in the United States. See id. The family is currently trying to secure a passport for the child. See Hr'g Tr. 8:22–9:1.

Plaintiff "Patricia" and her husband are citizens of unspecified countries in Western Europe. See FAC ¶ 16. They have lived in the United States for over six years and are here on G-4 visas. See Decl. of Patricia ¶¶ 3, 5, ECF No. 3-2. Patricia and her husband work for international organizations that possess international-organization immunity. See FAC ¶ 16. Patricia is currently pregnant with their second child, due around April 2027. See id.

Finally, Plaintiff "Gregory" is a citizen of Canada, where he also resides. See FAC ¶ 18. He and his non-U.S.-citizen husband "are currently expecting their first children—twins—through surrogacy to be born in the United States in January 2027." Id.; see Hr'g Tr. 9:13–14. They engaged in a commercial transaction with the surrogate mother. FAC ¶ 18.

Plaintiffs seek to certify a class representing nearly all people born in the United States and subject to EO2, along with their parents. See Class Mot. at 2. The only children covered by EO2 that are excluded from the proposed class are children born to a foreign diplomatic officer

accredited to the United States—that is, foreign government workers with diplomatic immunity. See id. They also request a preliminary injunction barring enforcement of EO2 against all members of the class. See PI Mot. at 3–4. Defendants oppose both class certification and any preliminary injunction. See Opp'n at 2.

## II. Standing

The federal judicial power is limited to actual cases and controversies. U.S. Const. art. III, § 2. To satisfy the case-or-controversy requirement, a plaintiff must establish standing. See Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 133 (2011). He must show (1) that he suffered an injury in fact, *i.e.*, "an invasion of a legally protected interest" that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant's challenged conduct; and (3) that the injury would likely "be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338–39 (2016) (citation omitted).

At the preliminary-injunction stage, a plaintiff must convincingly show that he "is 'likely' to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (citation omitted). And "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" when, as here, multiple plaintiffs seek the same injunctive relief. J.D. v. Azar, 925 F.3d 1291, 1325 (D.C. Cir. 2019) (citation omitted). Several of the Plaintiffs have standing.

An "injury to one's constitutional rights" can confer standing. FDA v. All. for Hippocratic Med., 602 U.S. 367, 381 (2024). The Fourteenth Amendment guarantees "citizenship to nearly all children born in the United States." Barbara, 609 U.S. at 741. EO2 denies Plaintiffs Nathan, Eleanor, and Alexander's child—all born after EO2 was issued—of that "most precious right" and the benefits that come with it. Kennedy v. Mendoza-Martinez, 372

U.S. 144, 159 (1963). This is a quintessential injury in fact. See CASA III, 838 F. Supp. 3d at 513. Moreover, Plaintiffs Patricia and Gregory, both of whom are expecting children in 2027, have standing to seek prospective relief on behalf of their soon-to-be-born children, who face a "credible threat" of being denied citizenship under EO2 § 2(b) and § 2(c), respectively. First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. 174, 184 (2026); see Lewis v. Thompson, 252 F.3d 567, 584–85 (2d Cir. 2001) (holding noncitizen women had third-party standing to invoke the citizenship rights of their expected babies); CASA I, 793 F. Supp. 3d at 695 (holding pregnant women had standing to challenge EO1 on behalf of their unborn children).

True, Nathan and Eleanor have received American passports because of the current injunction against EO2 in CASA. But "[a]s the Supreme Court has held, preliminary injunctive relief does not defeat Article III standing; the relief is by definition temporary, leaving the threat of future injury in place." O.A. v. Trump, 404 F. Supp. 3d 109, 145 (D.D.C. 2019); see Nielsen v. Preap, 586 U.S. 392, 403 (2019) (plurality opinion) ("Unless that preliminary injunction was made permanent and was not disturbed on appeal, [plaintiffs] faced the threat of [injury]."). The threat of future injury is palpable here, as Defendants are actively trying to dissolve the CASA III injunction and intend to appeal. See Defs.' Mot. to Dissolve Prelim. Inj. or, in the Alternative, Stay the Prelim. Inj. Pending Appeal, ECF No. 183, CASA v. Trump, No. 25-cv-201 (D. Md.); Hr'g Tr. 35:15–23. As such, that some Plaintiffs may be temporarily shielded from EO2 while the CASA court's "preliminary injunction is in place, of course, does not deprive [them] of their standing." Doe 2 v. Mattis, 344 F. Supp. 3d 16, 27 (D.D.C. 2018).

The remaining standing requirements are easily satisfied. See CASA III, 838 F. Supp. 3d at 512. The injury is directly traceable to EO2 and the agency officials responsible for enforcing

it. See id. at 512 n.3. And a preliminary injunction prohibiting Agency Defendants from enforcing EO2 against Plaintiffs would redress that injury or prevent it from occurring. See id.

Defendants' counterarguments are unpersuasive. They first contend that after TransUnion LLC v. Ramirez, 594 U.S. 413 (2021), standing for each class member must be established before relief is awarded. See Opp'n at 10. That is true in the context of a Rule 23(b)(3) damages class, where each class member gets an individual remedy. See TransUnion, 594 U.S. at 431 ("Every class member must have Article III standing in order to recover individual damages."). But Plaintiffs seek to certify a Rule 23(b)(2) class and request a uniform equitable remedy. In this setting, "courts may award class-wide injunctive or declaratory relief . . . so long as one member of the class has standing." Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin ("RAICES"), 174 F.4th 81, 114–15 (D.C. Cir. 2026) (collecting cases and authorities pre- and post-dating TransUnion). So Defendants' concession that Patricia has standing, see Opp'n at 13, alone makes this case justiciable, J.D., 925 F.3d at 1324 ("[O]nly one of the class *representatives* needs standing.").

Defendants next argue that because none of the named Plaintiffs fall within the alien-enemy exception, they lack standing to challenge that exception. See Opp'n at 13–14. But that argument goes to whether the proposed class should be certified—not standing. To be sure, the line between standing and class certification can blur where a class representative seeks "to litigate harms not precisely analogous to the ones she suffered but harms that were nonetheless suffered by other class members." 1 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 2:6 (6th ed. 2026). The Courts of Appeals have coalesced around two approaches to addressing this issue. See Chavez v. Plan Benefit Servs., Inc., 108 F.4th 297, 307–11 (5th Cir. 2024) (discussing the divergent approaches in detail). Under the class-certification approach,

followed by the First, Third, Sixth, and Ninth Circuits, once named plaintiffs demonstrate standing to pursue their own claims, the standing inquiry is concluded, and the court proceeds to analyzing whether Rule 23's prerequisites for certifying a class have been met.[3] Under the standing approach, followed by the Second and Eleventh Circuits, the named plaintiffs must also show that their injuries and interests are sufficiently similar to those of the unnamed class members.[4] Supreme Court opinions provide support for both approaches. See Gratz v. Bollinger, 539 U.S. 244, 263 & n.15 (2003) (noting the "tension in [its] prior cases" on this issue but declining to resolve it); compare Sosna v. Iowa, 419 U.S. 393, 402–03 (1975) (applying class-certification approach), and Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157–60 (1982)

[3] See, e.g., Boley v. Universal Health Servs., Inc., 36 F.4th 124, 133 (3d Cir. 2022) (explaining that named plaintiffs established standing and that defendants' "concerns regarding the representation of absent class members might implicate class certification or damages but are distinct from the requirements of Article III"); In re Asacol Antitrust Litig., 907 F.3d 42, 49 (1st Cir. 2018) ("Nothing . . . suggests that the claims of the named plaintiffs must in all respects be identical to the claims of each class member. Requiring that . . . to establish standing would confuse the requirements of Article III and Rule 23." (alteration, internal quotation marks, and citations omitted)); Melendres v. Arpaio, 784 F.3d 1254, 1262 (9th Cir. 2015) ("[O]nce the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." (citation omitted)); Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423 (6th Cir. 1998) ("Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23.").

[4] See, e.g., Barrows v. Becerra, 24 F.4th 116, 129 (2d Cir. 2022) ("[A] named plaintiff may have class standing to assert claims on behalf of other class members if 'he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.'" (citation omitted)); Fox v. Ritz-Carlton Hotel Co., LLC, 977 F.3d 1039, 1046 (11th Cir. 2020) ("First, the class representative must 'satisfy the individual standing prerequisites of the case or controversy requirement. Second, the class representative must also be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks and citations omitted)).

(same), with Blum v. Yaretsky, 457 U.S. 991, 997, 999–1001 (1982) (applying standing approach).

Courts in this District have generally taken the class-certification approach. See Molock v. Whole Foods Mkt., Inc., 297 F. Supp. 3d 114, 130 (D.D.C. 2018), aff'd on other grounds, 952 F.3d 293 (D.C. Cir. 2020); In re McCormick & Co., Inc., 217 F.Supp.3d 124, 143–44 (D.D.C. 2016). That route has doctrinal appeal: "[W]hile standing doctrine is primarily concerned with ensuring that a real case or controversy exists, Rule 23(a)'s requirements are designed precisely to address concerns about the relationship between the class representative and the class." 1 Rubenstein § 2:6. And because "the Supreme Court has long recognized that only one plaintiff need demonstrate standing to satisfy Article III in cases seeking injunctive or declaratory relief," RAICES, 174 F.4th at 114, the class-certification approach seems more apt in in the Rule 23(b)(2) context. But the Court need not pick a side because Plaintiffs' case can proceed under either approach.

As discussed above, Plaintiffs have "standing for" the "claim that they press" and for the "form of relief that they seek." TransUnion, 594 U.S. at 431. So under the class-certification approach, the Court would "shift the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class.'" Sosna, 419 U.S. at 402–03 (citation omitted). Nor would Plaintiffs stumble under the standing approach, as their claims and injuries do not "implicate a significantly different set of concerns" than those of unnamed plaintiffs affected by the alien-enemy provision. Gratz, 539 U.S. at 265. Quite the opposite: Plaintiffs' claims and Defendants' conduct giving rise to those claims "wholly implicate the same concerns with respect to each member of the class that Plaintiffs seek to represent." Chavez, 108 F.4th at 313. All putative class members were injured

or are likely to be injured in the same way (denial of citizenship) by the same allegedly illegal actions (implementation of EO2) taken by the same defendants. Any lingering issue regarding Plaintiffs' ability to represent other affected individuals is relevant not to standing but only to class certification, to which the Court now turns.

## III. Class Certification

District courts have "broad discretion in deciding whether to permit a case to proceed as a class action." Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994). To proceed on behalf of a class, Plaintiffs must clear two hurdles. First, the putative class representatives must demonstrate that "(1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four prerequisites are referred to as numerosity, commonality, typicality, and adequacy of representation. See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460 (2013). Second, aspiring class representatives must show that "their proposed class falls into one of the [three] categories of class actions enumerated in Rule 23(b)." DL v. District of Columbia, 860 F.3d 713, 723 (D.C. Cir. 2017). Plaintiffs invoke Rule 23(b)(2), which permits class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs seek to certify the following class:

> All persons, and the parents (including expectant parents) of those persons: (1) who are born in the United States as defined in 8 U.S.C. § 1101(a)(38)[5]; (2) who are not born to a foreign diplomatic officer accredited to the United States; (3) for whom neither parent is a U.S. Citizen; and (4) for whom either parent is or will be categorized by the government as falling within §§ 2(a)-(c) of Exec. Order No. 14,418, Continuing to Protect the Meaning and Value of American Citizenship, 91 Fed. Reg. 51,991 (2026).

Class Mot. at 2. Courts have "broad discretion to redefine and reshape the proposed class to the point that it qualifies for certification under Rule 23." Wagner v. Taylor, 836 F.2d 578, 589–90 (D.C. Cir. 1987); see also 7A Wright & Miller's Federal Practice & Procedure § 1759 (4th ed. 2025) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may . . . redefine the class to bring it within the scope of Rule 23."). The Court will certify the proposed class with two modifications.

*First*, the class will be limited to children born on or after August 6, 2026—the date EO2 was issued. To be sure, the parties dispute to whom EO2 applies. Unlike the first Executive Order, which applied "only to persons who are born within the United States after 30 days from the date of th[e] order," EO1 § 2(b), EO2 "does not state that it applies only to babies born after it was issued or after a certain date in the future," CASA III, 838 F. Supp. 3d at 513. In light of this discrepancy, the "only fair reading," according to Plaintiffs, is that EO2 applies to people born *before* and after its issuance. See Class Mot. at 4–5 (citation omitted). Defendants respond that EO2 "is prospective only." See Opp'n at 5. Defendants have the better reading.

Under the presumption against retroactivity, a new law should not be interpreted to attach "new legal consequences to events completed before its enactment" absent a clear statement to the contrary. Landgraf v. USI Film Prods., 511 U.S. 244, 269–70 (1994); accord Cox v.

[5] This includes children born in "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(a)(38).

Kijakazi, 77 F.4th 983, 991 (D.C. Cir. 2023) (explaining that under the presumption, "we read laws as prospective in application unless Congress has unambiguously instructed otherwise" (internal quotation marks and citation omitted)). EO2 is silent on retroactivity, so the presumption applies. Cf. Sea-Land Serv., Inc. v. ICC, 738 F.2d 1311, 1314 (D.C. Cir. 1984) (declining to apply the presumption because "[t]he plain language of the Executive Order ma[de] clear that the President intended it to have retroactive impact"). On top of that, the agencies charged with implementing EO2 have uniformly called it "prospective only." FAC ¶ 61. These reasonable interpretations are "consistent with the terms of the Executive Order" and are thus given "significant weight." City & County of San Francisco v. Trump, 897 F.3d 1225, 1241–42 (9th Cir. 2018); see, e.g., Udall v. Tallman, 380 U.S. 1, 4 (1965) (deferring to an agency's "reasonable interpretation" of an executive order, even though the order "permitted" other interpretations). Any lingering doubt is dispelled by Defendants' counsel confirming that EO2 does not apply to anyone born before it was issued. See Hr'g Tr. 62:22–25. The Court therefore construes EO2 as applying prospectively only.

But prospective starting from what date? EO2 was issued on August 6, 2026, so it presumably became effective on that date. See Lapeyre v. United States, 84 U.S. (17 Wall.) 191, 199–200 (1872); Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan, 870 F.2d 723, 728 (D.C. Cir. 1989); 44 U.S.C. §§ 1505(a), 1507. Defendants suggest that children born before the agency guidance came out on September 4 are not covered by EO2. See Opp'n at 11. But EO2 says no such thing. Had the Administration wanted EO2 to apply only to people born after a particular future date, it knew how to say so. Cf. EO1 § 2(b), 90 Fed. Reg. at 8449 (applying "only to persons who are born within the United States after 30 days from the date of this order"). So

EO2 is best read as encompassing people born on or after August 6, 2026—the date it was issued.

True, EO2 is enforced by agency implementation. See Opp'n at 11. And the EO2 guidance itself purports to be "prospective only" from the date of "publication"—September 4, 2026. E.g., SSA Guidance at 2; DOS Guidance at 1. But applying the guidance prospectively from that date does not answer whom it reaches. To illustrate, how will Agency Defendants treat someone like Nathan, who was born after EO2 but before the guidance, and who later seeks to renew his passport or apply for a Social Security Number? If the agencies intended to exclude children born during this interim period, presumably they would have said so clearly. Cf. DHS IFR, 91 Fed. Reg. at 57249 ("This IFR will apply to children born to foreign government employees on or after September 4, 2026; children born to a foreign government employee[] prior to that date will be treated consistently with the regulations in place at the time of their birth."). Indeed, when pressed about this ambiguity at oral argument, Defendants' counsel did not give an unequivocal answer. See Hr'g Tr. 50:13–53:13; 61:10–62:21. The Court must therefore include all children born after EO2 was issued in the class.[6]

*Second*, parents will be excluded from the class. The Court appreciates that parents of children affected by EO2 may suffer downstream harms—such as anxiety or potential penalties under the Government's registration scheme. See Class Mot. 11–12 & n.8. But "[t]he scope of a Rule 23(b)(2) class [should] track[] the extent of the violation," RAICES, 174 F.4th at 116—

[6] Of course, the Court has continuing authority to revise the class definition as litigation progresses should the circumstances warrant. See Wagner, 836 F.2d at 589–90; Fed. R. Civ. P. 23(c)(1)(C). So if Defendants were to start applying EO2 retroactively or make clear that only children born after September 4 are at risk of being denied citizenship, the Court could modify the class accordingly. See, e.g., Petties v. District of Columbia, 894 F. Supp. 465, 470 (D.D.C. 1995) (expanding certified class after additional evidence showed that defendants' unlawful conduct also injured persons excluded from the original class).

here, the denial of birthright citizenship to U.S.-born *children*. As the district court in Barbara reasoned when excluding parents from its class covering children affected by EO1: "[T]he harms to the parents of children denied citizenship are (a) not the subject of the specific claims in the complaint, which refer to the Executive Order's denial of citizenship to children, and (b) would not necessarily meet Rule 23(a)'s requirements for commonality and typicality as the enumerated harms are factually and legally diverse." 790 F. Supp. 3d at 90–91; see also CASA II, 793 F. Supp. 3d at 726 (similarly excluding parents from the class definition).

Nor is there any practical imperative to include parents in the class. Parents may litigate on behalf of their children without becoming class members themselves. See Fed. R. Civ. P. 17(c)(1). Plus, a preliminary injunction covering a child-only class would prevent the derivative harms parents may suffer. Cf. Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (explaining that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). The Court will therefore certify and focus its Rule 23 analysis on the following, narrower class:

> All persons born on or after August 6, 2026: (1) who are born in the United States as defined in 8 U.S.C. § 1101(a)(38); (2) who are not born to a foreign diplomatic officer accredited to the United States; (3) for whom neither parent is a U.S. Citizen; and (4) for whom either parent is or will be categorized by the government as falling within §§ 2(a)-(c) of Exec. Order No. 14418, Continuing to Protect the Meaning and Value of American Citizenship, 91 Fed. Reg. 51991 (2026).

A. Rule 23(a)

Rule 23(a) has four requirements—numerosity, commonality, typicality, and adequacy of representation. The Court takes each in turn.

1. *Numerosity*

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there are "no hard rules for when joinder will be found to be

impracticable, courts generally find numerosity satisfied when a plaintiff presents credible evidence that a proposed class has at least forty members." Angelica S. v. HHS, 786 F. Supp. 3d 158, 176 (D.D.C. 2025) (internal quotation marks and citations omitted). And "classes including future claimants generally meet the numerosity requirement due to the impracticality of counting such class members, much less joining them." J.D., 925 F.3d at 1322 (cleaned up). Other relevant factors include judicial economy and geographical dispersion of class members. See J.G.G. v. Trump, 813 F. Supp. 3d 126, 150 (D.D.C. 2025).

Plaintiffs' putative class clears the numerosity bar with room to spare. Thousands of children are born annually in the United States to so-called "birth tourists." See Visas: Temporary Visitors for Business or Pleasure, 85 Fed. Reg. 4219, 4219–25 (Jan. 24, 2020) (codified at 22 C.F.R. pt. 41); Jeremy L. Neufeld, The Birth Tourism Bogeyman, Niskanen Ctr. (Mar. 5, 2020), https://perma.cc/N7VQ-9W5B. And thousands more are born yearly through surrogacy arrangements involving foreign intended parents. See Alexandra Herweck et al., International Gestational Surrogacy in the United States, 2014–2020, 121 Fertility & Sterility 622, 627 tbl.2 (2024) (reporting 7,373 U.S.-born children via surrogacy for international intended parents between 2014 and 2020). So children falling within EO2's commercial-transaction category alone satisfy the numerosity requirement. See, e.g., J.D., 925 F.3d at 1322–23 (affirming numerosity based partly on migration statistics concerning unaccompanied children).

Moreover, at any given time, tens of thousands of noncitizens work in the United States for foreign governments and international organizations entitled to organizational immunity. See Class Mot. at 6 & n.2; Reply at 10. And the Government believes there are at least tens of thousands of foreign nationals in the United States who belong to FTOs or SDGT groups. See,

e.g., U.S. Dep't of Justice, Full-Scale Response: A Report on the Department of Justice's Efforts to Combat MS-13 from 2016–2020 at 3 (Jan. 20, 2021), https://perma.cc/4S8Y-XVLU ("MS-13 has an estimated 10,000 members across the United States."); J.G.G., 813 F. Supp. 3d at 133–35 (discussing the Administration's removal of 137 Venezuelan nationals believed to be members of Tren de Aragua). Given that roughly 4% of women of reproductive age are pregnant at any given moment, see Class Mot. at 6, hundreds of children are likely born every year that could be denied citizenship under EO2's "foreign government employee" and alien-enemy provisions. See Hinton v. District of Columbia, 567 F. Supp. 3d 30, 52 (D.D.C. 2021) (explaining that courts may "draw reasonable inferences from the facts presented to find the requisite numerosity" (citation omitted)).

All told, Plaintiffs have easily satisfied the numerosity requirement by supplying a reasonable estimate of putative class members that exceeds thousands. See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem, 793 F. Supp. 3d 19, 98 (D.D.C. 2025). Joinder of these geographically dispersed class members would be impracticable, especially because the class grows by the day. See J.D., 925 F.3d at 1322.

### 2. *Commonality*

For a class to be certified, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." The commonality requirement is a "low bar." Harris v. Koenig, 271 F.R.D. 383, 389 (D.D.C. 2010) (citation omitted). A single common question "capable of classwide resolution" is sufficient, so long as its answer resolves an issue central to each class member's claim. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 359 (2011).

The members of the Court's narrowed class satisfy the commonality requirement. All class members will "suffer[] the same injury" under EO2—denial of birthright citizenship.

Borum v. Brentwood Vill., LLC, 324 F.R.D. 1, 16 (D.D.C. 2018). And there are common questions capable of classwide resolution. For instance, are the exceptions to birthright citizenship under the Fourteenth Amendment or § 1401 a closed set? If so, do EO2 §§ 2(a)-(c) go beyond that set? See Class Mot. at 10–12; Opp'n at 2–3, 20; Reply at 7. A yes or no answer to those contested questions "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350. The commonality requirement is thus "easily met" in this case, as it is "in most cases." 1 Rubenstein § 3:20.

Defendants contend commonality is absent because EO2's categories "are each premised on different historical and common-law underpinnings." Opp'n at 15. That is true but irrelevant. Rule 23(a)(2) does not require that all questions of law or fact be common—one common question is enough. See Wal-Mart, 564 U.S. at 359; Garcia v. Johanns, 444 F.3d 625, 631 (D.C. Cir. 2006) ("To establish commonality under Rule 23(a)(2), a plaintiff must identify at least one question common to all members of the class."). And "the common question presented need not resolve *every* issue in the case." Scott v. Dart, 99 F.4th 1076, 1091 (7th Cir. 2024), cert. denied, 145 S. Ct. 1166 (2025).

*3. Typicality*

To show typicality, Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." J.D., 925 F.3d at 1322. The requirement is met "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." Little v. Wash. Metro. Area Transit Auth., 249 F.

Supp. 3d 394, 420 (D.D.C. 2017) (citation omitted). The typicality and commonality inquiries often overlap. Falcon, 457 U.S. at 157 n.13.

Typicality is satisfied here for the same reasons commonality is satisfied. The putative class representatives and the other class members bring the same claims, face the same injury caused by the same EO, have the same interests, and advance the same core legal theory—namely, that the exceptions to birthright citizenship elaborated in Wong Kim Ark and the INA are exclusive, and EO2 unlawfully adds to or expands them. See Class Mot. at 10–12; see also J.D., 925 F.3d at 1322 ("[T]ypicality is ordinarily met 'if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory.'" (quoting 7A Wright & Miller's Federal Practice & Procedure § 1764 (3d ed. 2019))).

True, the class members may make different downstream legal arguments depending on which provision of EO2 affects them. See Opp'n at 15. But the named class members' "claims need not be identical with the absent class members" to be typical. Shenk v. Mallinckrodt PLC, 300 F. Supp. 3d 279, 282 (D.D.C. 2018); see also Wagner, 836 F.2d at 591 ("[T]ypicality is not destroyed merely by 'factual variations.'" (citation omitted)). It is enough that the class representatives here have suffered or will suffer "injuries in the same general fashion as absent class members," In re APA Assessment Fee Litig., 311 F.R.D. 8, 15 (D.D.C. 2015) (citation omitted), each class member's claim "arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (citation omitted). Ultimately, the "test for typicality," like that for commonality, "is not demanding," 1 Rubenstein § 3:29, and is satisfied here because the claims

of the named plaintiffs and of absent class members are based on the same core set of facts and underlying legal theories.

*4. Adequacy*

Finally, the named plaintiffs and their counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy requirement aims to ensure that absent class members will not be bound by the outcome of a suit in which they were not competently and fairly represented." J.D., 925 F.3d at 1312. It imposes two conditions on plaintiffs seeking to represent a class: (1) "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class," and (2) "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1997) (citation omitted).

Defendants seem to suggest that the named representatives are inadequate because none are affected by the alien-enemies provision of EO2. See Opp'n at 14–15. That is not the standard for inadequacy, however. Regardless of the section of EO2 that applies to them, Plaintiffs and unnamed class members all seek the same relief across the entirety of the class—an injunction preventing enforcement of EO2. Their interests are therefore aligned. See 1 Rubenstein § 3:59 ("When the class representative's claims are for the same type of relief as those of the class, there is no obstacle to them being an adequate representative."). Nor do Defendants point to any conflict, actual or potential, arising between the proposed class representatives and unnamed members of the class. So the Court concludes the class representatives will fairly and adequately protect the interests of the class.

Defendants, moreover, do not dispute that Plaintiffs' counsel would ably represent both the class representatives and the unnamed class members' interests. See Opp'n at 14–18. The

Court concurs that named plaintiffs and class counsel are up to the task of shepherding this class action.

* * *

None of the named plaintiffs, it is true, will have their citizenship stripped by EO2's alien-enemy provision. See Opp'n at 14–15. But Rule 23(a) asks whether the proposed class, which includes such children, satisfies numerosity, commonality, typicality, and adequacy. It does. The Court will therefore proceed to consider whether the proposed class falls into one of the three categories of class actions listed in Rule 23(b). See DL, 860 F.3d at 723.

B. Rule 23(b)(2)

Plaintiffs seek to certify a class under Rule 23(b)(2). Certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Wal-Mart, 564 U.S. at 360 (citation omitted).

This case fits Rule 23(b)(2) like a glove. Plaintiffs ask the Court for a single declaration and injunction that "Defendants may not deny or abridge their . . . birthright citizenship." Class Mot. at 13. Class members, in other words, "would all sink or swim together." In re Allstate Ins. Co., 400 F.3d 505, 507 (7th Cir. 2005) (Posner, J.). And because enforcement of EO2 would likely constitute unlawful behavior towards the entire class as limited by the Court, see infra Section IV.A, the "single injunction or declaratory judgment would provide relief to each member of the class." Wal-Mart, 564 U.S. at 360. At bottom, "Rule 23(b)(2) exists so that

parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." DL, 860 F.3d at 726; see also, e.g., Barbara, 790 F. Supp. 3d at 98 (concluding that the class challenging EO1 "fit[] comfortably into the Rule 23(b)(2) category"); CASA II, 793 F. Supp. 3d at 717 (concluding that "the requirements of Rule 23(b)(2) are easily met"). This suit therefore may proceed as a Rule 23(b)(2) class action.

C. Certified Class, Class Representatives, and Class Counsel

With Rule 23 satisfied, the Court will certify a Rule 23(b)(2) class consisting of:

> All persons born on or after August 6, 2026: (1) who are born in the United States as defined in 8 U.S.C. § 1101(a)(38); (2) who are not born to a foreign diplomatic officer accredited to the United States; (3) for whom neither parent is a U.S. Citizen; and (4) for whom either parent is or will be categorized by the government as falling within §§ 2(a)-(c) of Exec. Order No. 14418, Continuing to Protect the Meaning and Value of American Citizenship, 91 Fed. Reg. 51991 (2026).

Clara, as next friend to Nathan; Edward, as next friend to Eleanor; Alexander, as next friend to his newborn child; and Patricia and Gregory, as next friends to their expected children, are hereby appointed as class representatives. See CASA II, 793 F. Supp. 3d at 732 (appointing parents of already born and soon-to-be-born children as next-of-friend class representatives); Hawkins v. Wash. Metro. Area Transit Auth., 311 F. Supp. 3d 94, 101–02 (D.D.C. 2018) (recognizing a parent as the child's next friend despite the caption's omission of that designation).

In appointing class counsel, the ultimate question is whether counsel for the named plaintiffs can "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). The Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge

of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Plaintiffs' proposed class counsel—lawyers from the ACLU Immigrants' Rights Project; the ACLUs of New Hampshire, Maine, Massachusetts, and the District of Columbia; the Asian Law Caucus; the NAACP Legal Defense and Educational Fund; and the Democracy Defenders Fund—check every box. They are among the Nation's leading civil rights attorneys and "have extensive experience litigating class action lawsuits and other complex civil rights cases in federal court." Class Mot. at 13; see also Class Mot., Exs. A–H (providing declarations from proposed class counsel). Notably, several served as class counsel in the Barbara litigation. See Class Mot. at 13. So the Court will appoint them all as class counsel.

D. Overlapping Classes & Injunctions

Defendants contend that certification is unnecessary because many of the class members are also members of the class in CASA, and the judge in that case has already preliminarily enjoined EO2's enforcement against that class. See Opp'n at 17; CASA III, 838 F. Supp. 3d at 522, 524. That argument rings hollow.

For starters, there is no rule against certifying a class that overlaps with a class proceeding in a parallel case—particularly when the cases are at early stages. See CASA II, 793 F. Supp. 3d at 729 (certifying the same class as Barbara and explaining that "certification of a nearly identical class in a different district does not obviate the need for class certification here"); 3 Rubenstein § 10:33 ("A common misunderstanding is that certification of a class in one suit somehow forestalls other related cases; in fact, only the preclusive effect of a final judgment can formally achieve that end and a decision simply certifying a class is not itself a final judgment.").

More fundamentally, as Defendants concede, the classes are "not the exact same." Opp'n at 17. The CASA class is tailored for EO1 and thus consists of children of non-Americans who are temporarily or unlawfully present in the United States. See CASA II, 793 F. Supp. 3d at 728–29. The class in this case, by contrast, is tailored to EO2 and includes children of parents who are neither unlawfully nor temporarily in the United States—such as the child of a permanent resident who works at a covered international organization. Indeed, Defendants are actively trying to dissolve the preliminary injunction in CASA precisely *because* that class "does not match" EO2. Reply at 11 (citation omitted). Defendants' complaint about some overlap in the classes thus falls on deaf ears.

## IV. Classwide Preliminary Injunction

With the procedural table set, the Court moves to the main course: Plaintiffs' motion to preliminarily enjoin enforcement of EO2.

"A preliminary injunction is an extraordinary remedy never awarded as of right," but as an exercise of discretion by a court sitting in equity. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). The moving party must make a clear showing that four factors, taken together, warrant relief: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014). The first and second factors are the most important. Nat'l Tr. for Historic Pres. in the U.S. v. NPS, 185 F.4th 1185, 1238 (D.C. Cir. 2026). And when the Government is the opposing party, factors three and four merge. Nken v. Holder, 556 U.S. 418, 435 (2009). If the movant carries his burden, "[c]rafting a preliminary injunction" remains "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the

substance of the legal issues it presents." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 579 (2017).

Plaintiffs seek to enjoin Agency Defendants from enforcing EO2 against the certified class. PI Mot. at 10. Defendants oppose.

A. Likelihood of Success on the Merits

The merits analysis begins with the main question Barbara left unanswered: What exceptions to birthright citizenship remain under the Citizenship Clause and § 1401? Plaintiffs contend, as Justice Kavanaugh did in his lone concurrence, that only the "closed set" of four exceptions from Wong Kim Ark remain: (1) "children of foreign sovereigns or their ministers"; (2) children "born on foreign public ships"; (3) children "of enemies within and during a hostile occupation of part of our territory"; and (4) "children of members of the Indian tribes." Barbara, 609 U.S. at 771 Kavanaugh, J., concurring in the judgment and dissenting in part) (quoting Wong Kim Ark, 169 U.S. at 693). They are correct. While the Fourteenth Amendment may theoretically permit new exceptions beyond those listed in Wong Kim Ark, Congress has not authorized any such exceptions.

After Barbara, "the common law exceptions identified in Wong Kim Ark were and remain the only Supreme Court-recognized exceptions to the rule of citizenship by birth" under the Citizenship Clause. CASA III, 838 F. Supp. 3d at 519. That is not to say that new exceptions could *never* be recognized under the Citizenship Clause. After all, the Constitution is not "trapped in amber." United States v. Rahimi, 602 U.S. 680, 691 (2024). Nor was the common law that "the Citizenship Clause incorporated." Barbara, 609 U.S. at 741. But any new exception under the Constitution, as was true at common law, would have to be "consistent with the principles" that underpin birthright citizenship. Rahimi, 602 U.S. at 692. Both the common

law and Citizenship Clause supply the relevant principle: only children born not subject to American laws can be excluded. Barbara, 609 U.S. at 736–37. One does not have to view Wong Kim Ark's exceptions as a literal "closed set" to recognize that any yet-to-be-recognized groups of children that fall under the same principle would likewise be few and exceptional.

Consider the most recent exception, which was recognized over two centuries ago. It arose because the relationship between the United States and Indian tribes was "unlike that of any other two people in existence." Cherokee Nation v. Georgia, 30 U.S. 1, 16 (1831) (Marshall, J.). U.S. law treated Indian tribes as "domestic dependent nations"—sovereign entities with powers of self-governance, despite "resid[ing] within the acknowledged boundaries of the United States." Id. at 16–17. Under this peculiar arrangement, Indians were typically not subject to general federal laws. See Sec'y of War John C. Calhoun, Condition of the Several Indian Tribes (Feb. 8, 1822), in 2 American State Papers: Indian Affairs 276 (Walter Lowrie & Walter S. Franklin eds., 1834) ("We have always treated them as an independent people . . . independent of our laws and authority."); Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 146–47 (1810) (Johnson, J., concurring) ("We legislate upon the conduct of strangers or [U.S.] citizens within their limits, but innumerable treaties formed with them acknowledge them to be an independent people."). Children born to parents in an Indian tribe were therefore excluded from birthright citizenship under the common law and Citizenship Clause because, as Senator Trumbull put it, the United States did not even "pretend to exercise any civil or criminal jurisdiction" over them. Cong. Globe, 39th Cong., 1st Sess. 2894 (May 30, 1866) (statement of Sen. Trumbull) ("I do not think they are subject to the jurisdiction of the United States in any legitimate sense."). Defendants do not contend, nor could they, that any of the groups targeted by EO2 are similarly immune from American laws.

In any event, Plaintiffs also challenge EO2 under § 1401—which the majority in Barbara did not analyze. By using the very language construed in Wong Kim Ark,[7] Congress incorporated that decision's broad citizenship rule and its narrow exceptions—and "only those exceptions." Barbara, 609 U.S. at 772 (Kavanaugh, J., concurring in the judgment and dissenting in part). As the Supreme Court has long recognized, when "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." George v. McDonough, 596 U.S. 740, 746 (2022) (cleaned up). This includes prior Supreme Court interpretations of the language it later enacts. See Lorillard v. Pons, 434 U.S. 575, 580–81 (1978); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012) ("If a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort . . . they are to be understood according to that construction."). The legislative history reinforces that Congress, when codifying birthright citizenship, understood that only the "exclusive groups" from Wong Kim Ark could be constitutionally denied this right. See Doe, 157 F.4th at 61; see 76th Cong. 418, 429 (Comm. Print. 1940).[8] Accordingly, this Court must "give effect to congressional intent by construing"

[7] The Citizenship Clause provides that "[a]ll persons born . . . in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The INA likewise provides that "person[s] born in the United States, and subject to the jurisdiction thereof" are "citizens of the United States at birth." 8 U.S.C. § 1401(a).

[8] The fact that Congress readopted the same language in 1952 in the INA is reason enough to presume that Congress intended no substantive change in the law. See Keck v. U S, 172 U.S. 434, 457 (1899) ("The re-enactment without change of phraseology, by implication, carried the previous interpretation and practice with it."); Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."). The legislative history points the same way. See Doe, 157 F.4th at 62–63.

the copied language in line with "the understanding of the [Constitution] that prevailed at the time of [the statute's] enactment." United States v. Kozminski, 487 U.S. 931, 945 (1988).

Moreover, only half of the exceptions in Wong Kim Ark's "closed set" are applicable in this case. Congress eliminated the tribal-Indian exception over a century ago. See Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253 ("That all non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States"); 8 U.S.C. § 1401(b). And the foreign-ship exception does not apply, as the class consists exclusively of children born on U.S. land. See PI Mot. at 17 n.3. That leaves two exceptions: (1) children born to "foreign sovereigns or their ministers" and (2) children "of enemies within and during a hostile occupation of part of our territory." Wong Kim Ark, 169 U.S. at 693.

So, do EO2's challenged categories fall within these two exceptions? Plaintiffs contend that they stretch far beyond the narrow confines of the ones recognized in Wong Kim Ark. Defendants retort that EO2's "categories (as elucidated by guidance) fall within [Wong Kim Ark's] 'closed set' and the common law that Barbara champions." Opp'n at 8. Tracing the law from its common-law roots through the codification of birthright citizenship validates Plaintiffs' position. EO2's expansive carveouts scarcely resemble those that Wong Kim Ark recognized and sweep in children that are fully governable by the United States. Thus, EO2's attempt to create new exceptions to birthright citizenship for children that are subject to U.S. law almost certainly violates the Citizenship Clause and § 1401.

### 1. *Alien Enemies in Occupied Territory*

Section 2(a) of EO2 denies birthright citizenship to children born to noncitizen parents when at least one of the parents "is an alien enemy." Someone is an alien enemy if, "based on

relevant government records and other indicators," the Government thinks they are affiliated with a FTO or SDGT group. DOS Guidance at 1. Defendants claim this category matches the common-law exception for "[1] an alien enemy [2] in hostile occupation of the place where the child was born." Wong Kim Ark, 169 U.S. at 658; see Opp'n at 21. Not so. For starters, the Administration's malleable definition of "alien enemy" is far broader than the understanding of the term in the common-law exception. More fundamentally, EO2's alien-enemy exception omits the core of the common-law exception: "a hostile occupation of part of our territory." Wong Kim Ark, 169 U.S. at 693. Without a hostile occupation, even true alien enemies and their children remain subject to U.S. courts and laws.

a. Alien-Enemy Status

"Alien enemy" has long been a term of art for a foreigner residing in the United States whose home country was at war with the United States. See Andrew Kent, The Alien Enemies Act of 1798, 95 Fordham L. Rev. 114, 135–40 (2026). That is how the Founding generation understood the term. See Ware v. Hylton, James Iredell's Circuit Court Opinion, June 7, 1793, reprinted in 7 The Documentary History of the Supreme Court of the United States, 1789–1800 at 268 (Maeva Marcus ed., 2003) [hereinafter Marcus] (explaining that a British creditor was an "Alien Enemy," and thus barred from suing in court, only if the United States was presently "in a state of War" with Britain). That was the definition when Wong Kim Ark constitutionalized the exception for children of alien enemies. See Frederic Jesup Stimson, Glossary of Technical Terms, Phrases, and Maxims of the Common Law 17 (1881) ("Alien enemy: the subject of a foreign nation at war with our own."); William C. Anderson, A Dictionary of Law 401 (1889) ("Alien enemy. One who owes allegiance to a government at war with ours, dwelling within our territory."). It was still the definition when Congress codified birthright citizenship. Johnson v.

Eisentrager, 339 U.S. 763, 769 n.2 (1950) ("[A]n alien enemy is the subject of a foreign state at war with the United States." (quoting Techt v. Hughes, 229 N.Y. 222, 229 (N.Y. 1920) (Cardozo, J.)). And it remains the definition to this day. Alien, Black's Law Dictionary (12th ed. 2024) ("A citizen or subject of a country at war with the country in which the citizen or subject is living or traveling.").

Given this settled historical meaning, EO2's attempt to expand who qualifies as an alien enemy does not pass constitutional muster. It is true that the thousands of FTOs and SDGT groups are, in the Executive's view, hostile to U.S. interests. See Opp'n at 21. But the Constitution requires more than that. See Ware v. Hylton, John Jay's Circuit Court Opinion, June 7, 1793, reprinted in 7 Marcus 293 (concluding that British citizens were no longer "alien enemies" after the Revolutionary War ended because "[t]here is a wide distinction between a power who is unfriendly and inimical to, and a power actually at war with the United States"). The Congresses that enshrined birthright citizenship into the Constitution and U.S. Code could not have "intended the definition of [alien] enemies to wait upon the varying terms of proclamations of future presidents, to be enlarged to-day, and restricted to-morrow." Techt, 229 N.Y. at 239; cf. Citizens Protective League v. Clark, 155 F.2d 290, 294 (D.C. Cir. 1946) (Prettyman, J.) (explaining that under the Alien Enemies Act, "whether the individual involved is or is not an alien enemy[] is . . . open to judicial determination").

b. Hostile Occupation

Even if alien-enemy status could fluctuate according to Presidential proclamations, EO2 faces another, insurmountable problem: the historical exception concerned *hostile occupation* of territory—not merely a parent's alien-enemy status. As Defendants seem to recognize, Wong Kim Ark's "hostile-occupation concept" is missing from EO2. Opp'n at 20. But that concept

was crucial to the meaning of the exception. By jettisoning it, EO2 § 2(a) is facially unconstitutional.

At common law, hostile occupation by an invading army was the *sine qua non* of the alien-enemy exception. See Inglis, 28 U.S. at 155–56 (Story, J.) (describing the exception for "children of enemies, born in a place . . . then occupied"); 2 Kent 42 ("If a portion of the country be taken and held by conquest in war, the conqueror acquires the rights of the conquered as to its dominion and government, and children born in the armies of a state while abroad and occupying a foreign country, are deemed to be born in the allegiance of the sovereign to whom the army belongs."); John Westlake, A Treatise on Private International Law, with Principle Reference to its Practice in England 286 (1880) ("British nationality results from birth in the British dominions, except in the case of a child born to an enemy father at a place in hostile occupation."). To illustrate, if the "French army, during a war with England, occup[ied] Jersey," then "the child of a French solider . . . born in Jersey during the hostile occupation" would be born "an alien." A.V. Dicey, A Digest of the Law of England with Reference to the Conflict of Laws with Notes of American Cases 176 (1896). But a "child of a French prisoner of war" born in English-controlled territory, in contrast, would be "a natural-born British subject" as the child—notwithstanding his alien-enemy parent—was born under British protection. Id. After all, where there is protection at birth, natural allegiance and obedience follows—the basic ingredients of citizenship under *jus soli*. Whittington, By Birth Alone, 49 Harv. J.L. & Pub. Pol'y at 474–76.

The "Citizenship Clause incorporated the common law." Barbara, 609 U.S. at 741. So it likewise excludes only children of foreign troops born "within and during a *hostile occupation* of part of our territory." Wong Kim Ark, 169 U.S. at 693 (emphasis added). Wong Kim Ark left

no daylight on this point. See id. at 655 ("hostile occupation"); id. at 658 ("alien enemy in hostile occupation of the place where the child was born"); id. at 665 ("hostile occupation"); id. at 682 (same); id. at 688 ("hostile occupation of part of our territory"). Nor did Reconstruction-era opinions that interpreted both the common-law rule and Fourteenth Amendment in tandem. See generally John Vlahoplus & Michael J. Rosin, Birthright Citizenship of Child Born to Enemy Alien Visitors, 103 Wash. U. L. Rev. Online 57 (2025) (discussing Mogridge v. United States, an 1872 decision recognizing the U.S. citizenship of a child born on American-controlled soil to visiting alien enemies during the War of 1812).

Barbara confirms that hostile occupation is essential. Jurisdiction, as used in the Citizenship Clause, refers "to the power of the United States to govern those within its territory." 609 U.S. at 736. That power is "necessarily exclusive and absolute" within the Nation's "own territory," Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, J.), except where it has been briefly displaced by a foreign, occupying army, see United States v. Rice, 17 U.S. (4 Wheat.) 246, 254 (1819) (Story, J.) (recognizing "sovereignty of the United States over" British-occupied part of Maine was "suspended" because "the laws of the United States could no longer be rightfully enforced there"). The upshot is that children born to members of "invading armies who temporarily occupy some American territory," unlike all other children born to enemies on U.S. soil, are "not governed by the United States" at birth and therefore do not acquire natural-born citizenship. Benjamin Keener & Keith E. Whittington, Demystifying Birthright Citizenship 20 (June 15, 2026) (unpublished manuscript), https://papers.ssrn.com/abstract=6948480. Or to put it in common-law terms, the United States cannot "protect[]" children born to alien enemies under such occupation, so those children do not owe "ligeance or obedience" to its laws in return. Calvin's Case, 77 Eng. Rep. at 394, 399; see

John Vlahoplus, Allegiance, Treason, and Birthright Citizenship, 57 Loy. U. Chi. L.J. 81, 110 (2026).

Notably, before EO2, that is precisely how the Government understood and justified the alien-enemy exception. U.S. Dep't of State, 8 Foreign Affs. Manual § 301.1-3(e)(1) (2021) ("If part of the United States were occupied by foreign armed forces against the wishes of the United States, children born to enemy aliens in the occupied areas would not be subject to U.S. jurisdiction and would not acquire U.S. citizenship at birth."). Fortunately, there have been no meaningful foreign occupations of American territory for over two centuries. Cf. Inglis, 28 U.S. at 155–56, 164–67 (Story, J.) (discussing citizenship of a child born to British loyalists in British-occupied New York during the Revolutionary War). That is why the alien-enemies exception is a relic of a bygone time. See Barbara, 609 U.S. at 764 n.52 (Jackson, J., concurring) (noting that the exception for children of diplomats is, practically, the sole exception "[a]t this point").

The treatment of children born to interned alien-enemy civilians during the Second World War leaves no doubt that the exception requires hostile occupation of American territory—not merely a parent's alien-enemy status. The Crystal City Alien Enemy Detention Facility ("Crystal City") in Texas was one of several enemy alien detention facilities during World War II. What set it apart from the rest was that it housed enemy aliens together with their families. See John E. Schmitz, Enemies Among Us 260 (2021). Yet all children born in Crystal City were citizens at birth. As the war in the Pacific kicked into high gear, the INS produced a publicity film on conditions at the camp. When the scene cuts to a nurse holding a newborn in the camp's maternity ward, the INS narrator declares: "Young America. About 250 Americans

were born in this hospital." See Nat'l Archives, Alien Enemy Detention Facility, Crystal City, Texas (c. 1942–1943), YouTube (posted Apr. 16, 2024), https://youtu.be/8j5NIQXUodo?t=593.

One of those infants was Tsuneo Larry Oda, born in Crystal City in January 1945, as the war entered its final year. His parents were Japanese nationals who were classified as enemy aliens. But because the United States—rather than Japan—exercised sovereign control over Crystal City, the Government deemed Oda a U.S. citizen at birth. Mr. Oda went on to serve in the U.S. Navy during the Vietnam War, even holding a top security clearance. Today, he lives in California, where he holds a U.S. passport, has a Social Security number, and is a registered California voter. See Amicus Br. of Prof. Eric. L. Muller at 11–13, Trump v. Barbara, No. 25-365 (U.S. Feb. 26, 2026) [hereinafter Muller Br.].

Congress shared the Executive's understanding of birthright citizenship for children born to alien enemies on U.S.-controlled soil. Harukichi (Jose) and Oyobu (Rosa) Watanabe were a Peruvian-Japanese couple brought to Crystal City for internment.[9] Gerald L. Neuman, Lessons for Birthright Citizenship from Suspension of Deportation 34–35, App'x 1(16) (Dec. 31, 2025) (unpublished manuscript), https://ssrn.com/abstract=5991454 [hereinafter Lessons]. They too were designated as alien enemies and had a child while held at Crystal City. Id. at 35. After the war ended, the Watanabes were scheduled to be deported back to Peru. Yet in 1951, the INS recommended suspending the Watanabes' deportation because their "*child is a citizen of the United States by birth* and is completely dependent upon [them] for support," and deportation "would result in serious economic detriment to *their minor citizen child*." Id. at 34. Congress

[9] About one thousand ethnically Japanese people domiciled in Peru—some of them Peruvian citizens—were deported from Peru to Texas for possible prisoner exchanges with Japan. See Edward N. Barnhart, Japanese Internees from Peru, 31 Pac. Hist. Rev. 169, 173, 176 (1962). They, like other non-U.S. citizens interned during WWII, were considered alien enemies. See id. at 173; Comm'n on Wartime Relocation and Internment of Civilians, 102d Cong., Personal Justice Denied 308–09 (Comm. Print 1992).

approved the suspension by concurrent resolution in 1952—the same month it adopted the INA. See S. Con. Res. 81, 82nd Cong. (1952); S. Rep. No. 82-1673 (1952); 98 Cong. Rec. 9415, 9418 (1952).

There are numerous other examples like these from Crystal City and other internment camps across the Nation. See Muller Br. at 14–19; Gerald L. Neuman, Birthright Citizenship and Suspension of Deportation, 61 Harv. C.R.-C.L. L. Rev. F. 78, 90–93 (2026). Suffice to say, at the time § 1401 was etched into the federal code, it was universally understood that a child of an alien enemy born on non-occupied U.S. soil became a U.S. citizen at birth.

To recap, a parent's purported status as an alien enemy, standing alone, cannot strip a U.S.-born child of his right to birthright citizenship. The alien-enemy exception, properly understood, applies only to children born to hostile enemy forces in temporarily occupied U.S. territory.[10] And because "no part of our country is under 'hostile occupation' by an enemy over whom the nation does not have the power to enforce its laws," EO2's alien-enemy provision has no lawful applications. CASA III, 838 F. Supp. 3d at 518 n.6.

Defendants' counterarguments miss the mark. They first contend that "Plaintiffs never explain—nor can they—how an alien *enemy*'s presence on this Nation's soil can be anything other than 'hostile.'" Opp'n at 21. Again, Defendants conveniently cut off the core component of the exception: "hostile *occupation*." Wong Kim Ark, 169 U.S. at 658 (emphasis added). Absent that, alien enemies on U.S. soil are "subject to American law" in every relevant sense—

---

[10] Children born in enemy-occupied territory to persons other than enemy aliens, in contrast, would still acquire U.S. citizenship at birth. See Vlahoplus, 57 Loy. U. Chi. L.J. at 106–10; Inglis, 28 U.S. at 156 ("[T]he children of enemies, born in a place within the dominions of another sovereign, then occupied by them by conquest, are still aliens; but the children of the natives, born during such temporary occupation by conquest, are, upon a reconquest or reoccupation by the original sovereign, deemed, by a sort of postliminy, to be subjects from their birth, although they were then under the actual sovereignty and allegiance of an enemy.").

and so their children are born as American citizens. Barbara, 609 U.S. at 734; see James C. Ho, Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment, 9 Green Bag 2d 367, 368–69 (2006) ("To be 'subject to the jurisdiction' of the U.S. is simply to be subject to the authority of the U.S. government. . . . The clause thus covers the vast majority of lawful and unlawful aliens.").

Defendants next claim that foreign invaders can occupy American territory without ever "holding" it for any "amount of time." Opp'n at 21. But that outside-the-box understanding of what it means to "occupy" land stretches the alien-enemy exception beyond what its text and history can bear. "[*O*]*ccupied* American soil," at common law and today, means "land no longer under the governing authority or possession of the United States." Keener & Whittington at 22 n.93. A "colloquial 'invasion,'" in other words, is not enough. Id. at 20 n.80.

Defendants' alternative position, that there is no hostile-occupation requirement, is ahistorical and contrary to the common law, as discussed above. It is also irreconcilable with Barbara. Because the Citizenship Clause "neatly captures the common law rule, with its broad reach and *narrow* exceptions," the Supreme Court explained, it covers "*nearly all* children born in the United States." 609 U.S. at 737, 741 (emphasis added). But how can that be so if, as Defendants believe, the government has broad discretion to label whomever it wants an alien enemy? See CASA III, 838 F. Supp. 3d at 515 (collecting examples of the Administration "hastily and without credible evidence attempting to remove people from the United States because of purported affiliations with groups deemed alien enemies"). Defendants do not point to "any evidence in the historical record that the ratifiers of the Fourteenth Amendment thought themselves to be" enshrining such flimsy protection of citizenship into the Constitution. Barbara,

609 U.S. at 749; see Afroyim v. Rusk, 387 U.S. 253, 263 (1967) (recognizing the Framers' intent was "to put citizenship beyond the power of any governmental unit to destroy").

Defendants next argue that Plaintiffs' facial challenge to the alien-enemy carveout cannot succeed because it requires them to "establish that no set of circumstances exists under which the [challenged provision in EO2] would be valid." Opp'n at 18 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). And Plaintiffs cannot do so, Defendants posit, because there could be hostile occupation of American cities "*in the future*." Id. at 20. This argument falls short thrice-over.

*First*, a "facial challenge is just that—a challenge to the terms of the statute, not hypothetical applications." Doe v. City of Albuquerque, 667 F.3d 1111, 1127 (10th Cir. 2012). "In determining whether a law is facially invalid," courts must be "careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449–50 (2008); see also Whole Woman's Health v. Hellerstedt, 579 U.S. 582, 625 (2016) ("[O]ur cases have never required us to proceed application by conceivable application when confronted with a facially unconstitutional statutory provision."). EO2's alien-enemy carveout is silent on hostile occupation. It simply directs agencies to withhold citizenship from children of parents who the Administration thinks belong to one of thousands of organizations on its continuously growing list. Withholding citizenship from U.S.-born children on that basis alone is always unconstitutional no matter how you slice it. Musing about EO2's constitutionality in the event of a hostile occupation—something that has not occurred in over two centuries—is speculation *ad absurdum* and strays well beyond EO2's text.

*Second*, when analyzing a facial challenge, "the proper focus of the constitutional inquiry" is the group for whom EO2 is a new restriction, not the group for whom the Order "is irrelevant." City of Los Angeles. v. Patel, 576 U.S. 409, 418 (2015). In Defendants' hypothesized scenario, EO2 would be irrelevant: If children of true alien enemies were born in actual occupied U.S. cities, they would be noncitizens by operation of the Fourteenth Amendment and § 1401(a). In other words, there are no constitutional applications of EO2 § 2(a) that are not captured by a pre-existing and superior source of law. See id. at 419 (explaining that consent or exigency-related searches did not defeat a facial challenge to a statute authorizing warrantless searches because the Fourth Amendment independently permitted those searches).

*Third*, Barbara all but forecloses Defendants' argument. Under their logic, EO1, which stripped citizenship from children of temporary and unlawful immigrants, could have had future constitutional applications as well. Yet Barbara upheld a facial challenge to EO1—presumably because that executive order, like EO2, was silent on hostile occupation and other sources of law already account for the alien-enemy exception.

2. *Foreign Ministers*

EO2's "foreign government employee" provision purports to exclude from citizenship the children of various employees of foreign governments and "international organization[s] that possess international-organization immunity," but who are not themselves entitled to full diplomatic immunity. See EO2 § 2(b)(ii)-(iv). Plaintiffs contend this goes beyond Wong Kim Ark's exception for children of "foreign ministers." 169 U.S. at 683. In their view, only the children of foreign-government officials with "full diplomatic immunity" fall within this exception. PI Mot. at 14–15. Defendants paint the common-law exception much more broadly,

extending it to all children of those "'employed in any . . . official capacity' by an extranational entity." Opp'n at 18 (quoting Wong Kim Ark, 169 U.S. at 652).

Although Wong Kim Ark never uses the phrase "full diplomatic immunity," Opp'n at 23, Plaintiffs are correct that its "foreign minister" exception applies only to children born to a parent with full diplomatic immunity—*i.e.*, a foreign ambassador or other foreign diplomatic officer accredited to the United States. All other "foreign government employees" and their children remain subject to the jurisdiction of the United States. To explain why, the Court again rewinds the clock to the early common law.

The governments "of all nations from ancient times have recognized the status of diplomatic agents." Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes, Apr. 18, 1961, 23 U.S.T. 3227 [hereinafter VCDR]. Ambassadors and foreign ministers, as fictional representatives of the foreign sovereign himself, were afforded the highest level of immunity: diplomatic immunity. This gave them "an entire independence" from the laws, "jurisdiction[,] and authority of the state" in which they served. Vattel 470; see Henry Wheaton, Elements of International Law 299 § 224 (8th ed. 1866) ("From the moment a public minister enters the territory of the State to which he is sent, during the time of his residence, and until he leaves the country, he is entitled to an entire exemption from the local jurisdiction, both civil and criminal."). In England, those cloaked with diplomatic immunity were subject only to *jus gentium*—the law of nations or public international law. See Edward Coke, 4 Institutes of the Laws of England: Concerning the Jurisdictions of Courts 153 (1644). Their immunity from domestic law enforcement was so strong that Blackstone observed in 1765 that "few, if any, examples have happened within a century past, where an embassador has been punished for any offence, however atrocious in its nature." 1 Blackstone 247.

Diplomatic immunity, unlike any other form of immunity, extended to the diplomat's full household—including his children. Vattel 497 ("The respect due to the embassador extends likewise to his children, who also partake of his immunities," thereby making them "exempt from the jurisdiction of the country"); see also Wheaton 300 § 225 ("[Diplomatic] immunity extends, not only to the person of the minister, but to his family."). So children of foreign diplomats born on British soil were not subject to British laws or authority—and therefore not afforded citizenship at birth under *jus soli*. See Calvin's Case, 77 Eng. Rep. at 399; 1 Blackstone 361.

American common law was no different. The young republic swiftly accorded diplomatic "immunity . . . to foreign ministers." Schooner Exchange, 11 U.S. at 138. As direct "representatives of their sovereigns," Kent's Commentaries explained, ambassadors and ministers "form an exception to the general case of foreigners resident in the country, and they are exempted absolutely from all allegiance, and from all responsibility to the laws of the country to which they are deputed." 1 Kent 38. Plus, the "independency of a Minister" in America, like in Europe, "extend[ed] to all his household." Respublica v. De Longchamps, 1 U.S. (1 Dall.) 111, 117 (Pa. O. & T. 1784). As a result, the American rule of *jus soli*, like its English progenitor, recognized the same narrow exception for children of officials with full diplomatic immunity. See Wong Kim Ark, 169 U.S. at 675 (explaining that it was "beyond doubt" that "*only* children of ambassadors or public ministers of a foreign government" were not given citizenship at common law (emphasis added)). In short, the common-law exception was "carefully defined" to include only those children who were beyond the reach of U.S. laws by virtue of their parents' diplomatic immunity. Barbara, 609 U.S. at 736.

The drafters of the Fourteenth Amendment restored *jus soli*'s almost all-encompassing scope and its narrow exception for children of parents imbued with diplomatic immunity. The Citizenship Clause would not provide citizenship to those "who belong to the families of embassadors or foreign ministers accredited to the Government of the United States," its principal author explained, but it would reach "every other class of persons." Cong. Globe, 39th Cong., 1st Sess. 2890 (May 30, 1866) (Sen. Howard). Reconstruction-era opinions interpreting the Fourteenth Amendment likewise understood the exception to cover only the children of fully immune foreign officials—ministers and ambassadors. See McKay, 16 F. Cas. at 162 ("Except in the case of children of ambassadors . . . . "); In re Look Tin Sing, 21 F. 905, 906 (C.C.D. Cal. 1884) (Field, J.) (discussing the exception for "children born in the United States of persons engaged in the diplomatic service of foreign governments, such as ministers and ambassadors"); see also Secretary Fish Memorandum at 394 (recognizing that with the limited exception of "the children of foreign ministers," "the status of citizenship" was "fixed by the place of nativity, irrespective of parentage"); Dicey 177 (describing the exception as limited to a child born to "an ambassador or other diplomatic agent accredited" to the sovereign).

Defendants say that Wong Kim Ark departed from this long-running understanding of the common law. In their view, the Court "suggested that the exception may be as broad as to apply to employees serving in *any* 'official capacity.'" Opp'n at 23 (quoting 169 U.S. at 705). But Wong Kim Ark did the opposite. It confirmed the centuries-long view that "children of *diplomatic* representatives of a foreign state," namely, the "children of ministers" and "ambassadors," were excluded from birthright citizenship. 169 U.S. at 678, 682 (emphasis added). On the other hand, the Court made clear that children born in the United States to foreign "consuls"—the next highest-ranking representatives of a foreign sovereign—acquired

U.S. citizenship at birth. Id. at 678–79. Unlike ambassadors and minsters, the Court explained, consuls were not "invested with a diplomatic character" and therefore were not "entitled by the law of nations to the privileges and immunities of ambassadors or public ministers"—or, more simply, diplomatic immunity. Id. Consequently, both foreign consuls and their children remain "subject to the jurisdiction" of the United States while they reside here. Id. That is why courts through the modern day have treated "full diplomatic immunity" as a prerequisite for denying birthright citizenship. Moncada v. Rubio, 153 F.4th 733, 738 (9th Cir. 2025); e.g., Nikoi v. Att'y Gen. of U.S., 939 F.2d 1065, 1066 (D.C. Cir. 1991) ("Because one parent was a foreign official with diplomatic immunity when each child was born, the births did not confer United States citizenship."); Raya v. Clinton, 703 F. Supp. 2d 569, 576 (W.D. Va. 2010) ("[I]f the plaintiff's father was entitled to diplomatic privileges and immunities in this country on the date the plaintiff was born, the plaintiff is not a United States citizen.").

Defendants' argument that Barbara expanded the category fares no better. To be sure, the Court grounded the diplomatic exception in a "fiction of extraterritoriality"—the legal fiction that ministers and their families remain on foreign soil—and the "intersovereign concerns" that justify it. Barbara, 609 U.S. at 728, 737. But these are not, as Defendant's claim, "open-ended concepts" that the Executive may invoke to expand the exception at will. Opp'n at 20. Those principles merely explain why the "children of foreign ministers" with full diplomatic immunity were excluded from the Citizenship Clause—not why the President may place the children of other foreign government employees equally beyond its reach. Barbara, 609 U.S. at 737.

Start with the fiction of extraterritoriality. Since its origins in the waning days of the Renaissance, the fiction has always been reserved for those who stand directly in the sovereign's stead abroad, cloaked in his sweeping immunity: ambassadors and ministers. See, e.g., Grotius

383 (explaining "all People that reside in Foreign Countries" are "subject to the laws of those countries" with an "Exception" for "Embassadors" who, "by a Sort of Fiction," are "imagined to be out of the Territories" to which they are sent); Wheaton 300 § 224 ("[T]he fiction of extra-territoriality . . . , by which the minister, though actually in a foreign country, is supposed still to remain within the territory of his own sovereign . . . gr[e]w[] out of the necessity that public ministers should be entirely independent of the local authority, in order to fulfil the duties of their mission."); Schooner Exchange, 11 U.S. at 138 (explaining that the "fiction of exterritoriality" applies to "foreign ministers" who have full "immunity . . . granted by the governing power of the nation to which the minister is deputed"); Barbara, 609 U.S. at 728 (explaining that the "fiction of extraterritoriality" applied to "ambassadors" and "their families"). Defendants cite no authority suggesting that the fiction has ever strayed, or could stray, beyond those carefully drawn lines.

The "intersovereign concerns" that gave rise to the fiction also define its limits. Barbara, 609 U.S. at 736–37. "The act of sending the minister on the one hand, and of receiving him on the other, amounts to a tacit compact between the two States that he shall be subject only to the authority of his own nation." Wheaton 300 § 224. "[W]ithout such exemption, every sovereign would hazard his own dignity by employing a public minister abroad." Schooner Exchange, 11 U.S. at 139. Walking back on *that* promise by "suddenly and without previous notice" applying U.S. law to a foreign official with full diplomatic immunity would "degrade the dignity of his nation" and thereby raise intersovereign concerns "of the highest character." Id. at 137. No such concerns arise when U.S. law is applied to any other foreigner on U.S. soil, however, because all other foreigners are "'amenable to' the Nation's jurisdiction." Barbara, 609 U.S. at 737 (quoting

Schooner Exchange, 11 U.S. at 144). That includes high-ranking foreign officials, like consuls. See, e.g., Gittings v. Crawford, 10 F. Cas. 447, 451 (C.C.D. Md. 1838).

Nor can Defendants' mistaken reading of Wong Kim Ark or Barbara be squared with the plain meaning of the Citizenship Clause's sole qualifier—"subject to the jurisdiction thereof." Diplomatic immunity, to this day, grants ambassadors and accredited public ministers "nearly absolute" immunity from civil and criminal jurisdiction—even for personal conduct unrelated to their official duties. Tabion v. Mufti, 73 F.3d 535, 536 (4th Cir. 1996); see 22 U.S.C. § 254d; VCDR art. 31(1). They cannot be hauled into court even to answer for alleged constitutional violations or breaches of *jus cogen* norms—such as human trafficking, torture, or extrajudicial killings. See Sabbithi v. Al Saleh, 605 F. Supp. 2d 122, 129 (D.D.C. 2009) (collecting cases); Devi v. Silva, 861 F. Supp. 2d 135, 141–42 (S.D.N.Y. 2012).

No other immunity stretches so far as to remove the holder from U.S. law's grasp. All other foreign government employees, by contrast, can be made to answer even for garden-variety misconduct. Even those with official-act immunity, like "consuls," remain "subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state." Moncada, 153 F.4th at 739 (quoting Coppell v. Hall, 74 U.S. (7 Wall.) 542, 553 (1869)). Indeed, DHS's new rule *continues* to recognize the well-settled distinction between one who enjoys "diplomatic agent-level immunity and *is therefore not subject to the jurisdiction of the United States*" and one who, like a consul, enjoys only "lesser status-based immunity." DHS IFR, 91 Fed. Reg. 57251 n.2 (emphasis added).

More importantly, the Citizenship Clause asks whether "*persons born*" on American soil are "subject to the jurisdiction" of the United States. Diplomatic immunity, as previously explained, is one-of-a-kind in that it relieves both the public minister and his family from U.S.

law—including newly born children. See 22 U.S.C. §§ 254a, 254d; VCDR art. 37(1); Carrera v. Carrera, 174 F.2d 496, 498 (D.C. Cir. 1949). Official-act immunity, conversely, does not extend beyond the official.[11] For those reasons, only children with full diplomatic immunity are outside the "power" and therefore "jurisdiction" of the United States. Barbara, 609 U.S. at 736. Defendants' effort to strip citizenship from the children of all foreign governmental employees and employees of international organizations with immunity is unlawful.

Even if the common law, precedent, or the constitutional text left room for doubt—which they do not—any ambiguity in the Citizenship Clause is eliminated by this Nation's consistent interpretation of that provision. "When faced with a dispute about the Constitution's meaning or application, '[l]ong settled and established practice is a consideration of great weight.'" Houston Cmty. Coll. Sys. v. Wilson, 595 U.S. 468, 474 (2022) (quoting The Pocket Veto Case, 279 U.S. 655, 689 (1929)). As James Madison put it: "a regular course of practice" by government actors can "liquidate & settle the meaning" of disputed or indeterminate "terms & phrases." Letter from James Madison to Spencer Roane (Sept. 2, 1819), in 8 The Writings of James Madison 447, 450 (Gaillard Hunt ed. 1908).

The Executive Branch has always understood that the historical exception turned on the diplomatic status and jurisdictional immunity of the parents—not simply employment by a foreign government in an official capacity or an international organization. Take, for instance, the 1896 State Department consular regulations governing the issuance of U.S. passports, which provided: "The circumstance of birth within the United States makes one a citizen thereof, even

[11] Indeed, plenty of American officials enjoy immunity for their official acts, too, including law enforcement officers, judges, prosecutors, legislators, and the President. See, e.g., Tenney v. Brandhove, 341 U.S. 367, 378–379 (1951); Pierson v. Ray, 386 U.S. 547, 553 (1967); Van de Kamp v. Goldstein, 555 U.S. 335, 340–341 (2009); Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curiam); Trump v. United States, 603 U.S. 593, 642 (2024). But no one would contend that they are not subject to American laws for purposes of the Citizenship Clause.

if his parents were at the time aliens, provided they were not, by reason of *diplomatic character* or otherwise, *exempted* from the jurisdiction of its laws." U.S. Dep't of State, Regulations Prescribed for the Use of the Consular Service 49 § 137 (1896) (emphasis added); see also U.S. Dep't of State, Instructions to the Diplomatic Officers of the United States 51 (1897) (explaining that only "children of foreign diplomatic representatives" were excluded). That regulation remained in force for decades, and the Department repeated this explanation in its revised regulations in the 1920s and again in its first codification in the Code of Federal Regulations in 1938. See Citizenship, Passports and Protection, Executive Order 4359-A (Dec. 19, 1925); 22 C.F.R. § 79.137 (1938).

An exchange between the United States and France that same year confirms that, in 1938, as in the centuries preceding it, the "diplomatic" exception was solely reserved for children with full diplomatic immunity. A dispute arose when American Embassy officials in Paris informed French officials that Jean Roger Goiran de Trans, who had been born in New York while his father served as a French consul, had acquired U.S. citizenship at birth. See Letter from Jules Henry, French Chargé, to the Secretary of State (Feb. 7, 1938), in 2 Foreign Relations of the United States: Diplomatic Papers, 1938, The British Commonwealth, Europe, Near East, and Africa 348 (1955) [hereinafter Foreign Relations]. A French official wrote to the Secretary of State, questioning why the child was considered an American citizen. Id. at 348–49.

The Secretary of State confirmed that Trans was a U.S. citizen by birth. "It has long been the view of the [State] Department," the Secretary responded, that under the Citizenship Clause "persons born in the United States of fathers who are in the employ of a foreign government other than in a diplomatic capacity are considered to be born subject to the jurisdiction of the United States and consequently acquire at birth the status of cities of the United States." Letter

from the Secretary of State to the French Chargé (March 3, 1938), in 2 Foreign Relations 349. And although consular officers "by reason of their office" might "have by law, treaty and usage, privileges not accorded to other aliens," they lacked the "diplomatic status" necessary to exclude their children from the Fourteenth Amendment's broad reach. Id. at 349–50.

France acknowledged the general rule but inquired whether the Department could craft a "practical solution" for "children born in the United States to career agents of the French Consular List." Letter from R. de Saint-Quentin, French Ambassador to the United States, to the Secretary of State (May 5, 1938), in 2 Foreign Relations 351. But there was no getting around the result, the Secretary of State explained, because "citizenship is acquired by such children under a provision of the Constitution of the United States." Letter from the Secretary of State to the French Ambassador (May 25, 1938), in 2 Foreign Relations 352.

The State Department's 1938 regulation and exchange with France—both of which acknowledge the Department's longstanding view that the phrase "subject to the jurisdiction thereof" excludes only children born to accredited diplomats—are particularly probative of the scope of the statutory right to birthright citizenship that was codified just two years later. See Loper Bright Enters. v. Raimondo, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."); Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 159 (1993) (noting a phrase "acquired a settled judicial and administrative interpretation over the course of a half century before Congress enacted" the relevant statute, and thus giving it that meaning). And the Congress that recodified that right in § 1401 shared this understanding. See S. Rep. No. 1137, at 38 (1952) ("The *only* exceptions [to

birthright citizenship] are those persons born in the United States to alien *diplomats*." (emphasis added)).

The Executive Branch, too, adopted this position from the day § 1401 was codified until EO2 was issued. See 8 C.F.R. § 101.3(a)(1) (2025) (recognizing that only a "person born in the United States to a foreign diplomatic officer accredited to the United States," *i.e.*, someone with full diplomatic immunity, "is not subject to the jurisdiction of the United States" and therefore "not a United States citizen" at birth). "That long and consistent Executive Branch interpretation" cements the conclusion that the foreign-minister exception concerns only officials with full diplomatic immunity. Barbara, 609 U.S. at 772 (Kavanaugh, J., concurring in the judgment and dissenting in part). Defendants' attempt to stretch the exception to cover an extensive assortment of "foreign government employees" thus cannot be squared with the common law, history, text, or longstanding practice.

So what children fall within the modern scope of the exception? Presently, "diplomatic immunity extends to only a narrow set of diplomatic officials, not to all foreign representatives." Barbara, 609 U.S. 837 (Thomas, J., dissenting) (cleaned up). Under the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 254a–254e, the VCDR governs the issue of diplomatic privileges and immunities. The VCDR, in turn, "premise[s] diplomatic immunity upon recognition by the receiving state." United States v. Lumumba, 741 F.2d 12, 15 (2d Cir. 1984).

In the United States, "a person's diplomatic status is established when it is recognized by the Department of State." Restatement (Third) of Foreign Relations Law of the United States § 464 (1987); see Carrera, 174 F.2d at 497. The State Department used to keep track of every accredited foreign diplomatic officer on its internal "Diplomatic List, also known as the Blue List." See 8 C.F.R. § 101.3(a)(2) (2025). It is unclear to the Court whether it still does. See PI

Mot. at 10 n.1. In any event, children born on U.S. soil to a foreign diplomatic officer accredited to the United States are excluded from the class. So EO2 § 2(b) is unlawful as applied to any class member.

*3. Commercial Transactions & Fraudulent Activity*

Finally, EO2 covers children of noncitizens if either parent "[1] engaged in a commercial transaction to purchase or access birthright citizenship for the person, or [2] engaged in fraudulent activity to obtain citizenship." EO2 § 2(c). This includes parents who "engage in a commercial transaction to ensure that the person's mother is present in the United States . . . to give birth," id. § 2(c)(i)—a group that Defendants appear to treat synonymously with "birth tourists." Opp'n at 15. It also includes parents who engage "in a commercial transaction with a surrogate present in the United States." EO2 § 2(c)(ii).

This exception plainly runs afoul of the Fourteenth Amendment and § 1401, as it bears no resemblance to the narrow few identified in Wong Kim Ark. On the contrary, it is cut from the same cloth as EO1's exception for children of parents unlawfully or temporarily present in the United States—an exception the Supreme Court has already rejected. Barbara, 609 U.S. at 737.

Start with the "birth-tourism" carveout.[12] Defendants argue that this exception "derives from the common-law rule that fraudulent transactions are 'voidable.'" Opp'n at 18–19 (quoting Restatement (2d) of Contracts § 164(1)). But the Court is interpreting the Fourteenth Amendment's Citizenship Clause—not a contract between private parties. So it must turn to the "common law of *citizenship*." Barbara, 609 U.S. at 729 (emphasis added); see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 338 (D.C. Cir. 2003) (explaining that courts "have no free-wheeling commission to construct common law as we see fit"). And the birth-tourist

[12] It is unclear whether children of "birth tourists" are denied citizenship under EO2 § 2(c) because their parents engaged in a commercial transaction, fraudulent activity, or both.

carveout does not even superficially resemble the traditional exceptions identified in Wong Kim Ark and Barbara.

What's more, Barbara already recognized these children are citizens. At the Supreme Court, the Solicitor General argued that children of "birth tourists"—that is, people who "travel to the United States solely to acquire citizenship for their children"—were not entitled to birthright citizenship under the Fourteenth Amendment because it "demeans U.S. citizenship by extending it to people who lack any meaningful ties to the country." Brief of Petitioners at 4, 9, Barbara, 609 U.S. 719 (No. 25-365) (cleaned up). The Supreme Court rejected that view because "a sovereign's jurisdiction made no exception for those only temporarily present within the sovereign's territory," Barbara, 609 U.S. at 737, "no matter how 'momentary and uncertain' [their] presence," id. at 728 (quoting Calvin's Case, 77 Eng. Rep. at 384). The dissenting Justices in Barbara likewise understood the Court's holding to resolve the question. Id. at 866 (Thomas, J., dissenting) (describing the majority as "recognizing a constitutional right to citizenship for the children of all foreign birth tourists and illegal aliens"); id. (Alito, J., dissenting) ("As interpreted by the Court today, the Fourteenth Amendment confers citizenship on virtually everyone who happens to be born in this country, including the children of 'birth tourists,' women who come here solely for the purpose of giving birth to a child and then promptly return home.").

The surrogacy exception is equally flawed. Nothing about it resembles the four mentioned in Wong Kim Ark. "Children born in the United States" via surrogacy are "subject to its power" no matter who the parents are. Barbara, 609 U.S. at 741. Indeed, foreign parents choose surrogacy arrangements in the United States precisely *to* have the child be governed by U.S. law and have the surrogacy process "supervised by a court." See Decl. of Edward ¶ 10; see

generally Johnson v. Calvert, 851 P.2d 776 (Cal. 1993) (en banc) (action concerning parentage and custody of child under surrogacy contract). Before EO2, the Government agreed. See U.S. Dep't of State, 8 Foreign Affs. Manual § 304.3-1(b) (2026) ("Children born in the United States acquire U.S. citizenship at birth . . . regardless of the use of [assisted reproductive technology] and/or surrogacy."). All that leaves only one conclusion: a child born on American soil via surrogacy is "subject to American law" and is therefore an "American citizen" at birth. Barbara, 609 U.S. at 734. Whatever one thinks of that conclusion as a policy matter, the answer cannot be to disregard the Supreme Court's controlling interpretation of the Fourteenth Amendment, as the drafters of EO2 appear to have done. "[A]s with most questions of law, the policy pros and cons are beside the point." Trump v. CASA, Inc., 606 U.S. 831, 856 (2025).

The same analysis holds true for any other "commercial transactions" swept up by EO2. "[P]rivate individuals" who travel to the United States for "business or caprice" are subject to the Nation's jurisdiction, as they owe a "temporary and local allegiance" to the Nation's laws. Barbara, 609 U.S. at 736 (quoting Schooner Exchange, 11 U.S. at 144). Their U.S.-born children would in turn owe "natural allegiance" and would therefore be "natural-born citizens." Wong Kim Ark, 169 U.S. at 656, 680.

For similar reasons, the catch-all and amorphous "fraudulent activity" exception is also unconstitutional. "[C]hildren born of parents unlawfully . . . present in the United States" are "citizens at birth," Barbara, 609 U.S. at 737, and Defendants offer no argument for why fraud should be treated differently from other means of being unlawfully present. Fraudsters and their children, like nearly everyone else on U.S. soil, are subject to U.S. laws. So a child born in the United States to foreign parents who entered the country by "fraud" nonetheless "acquire[s] United States citizenship at birth." INS v. Errico, 385 U.S. 214, 215 (1966); see also Reid v.

INS, 420 U.S. 619, 622–23 (1975) (recognizing that couple who fraudulently claimed American citizenship when entering the United States and later had "children after entry" would have qualified for the statutory deportation waiver for parents "of a United States citizen").

Longstanding executive practice only bolsters that conclusion. In the 1920s through 1940s, the Board of Immigration Appeals repeatedly suspended deportation of aliens who fraudulently entered the country—typically, using false identities to obtain visas—because deportation would have visited serious harm on their American-born citizen children. See Neuman, Lessons at 17–20 (discussing cases). These children became citizens at birth because they and their parents—like all children and parents without full diplomatic immunity—were subject to American laws. See Memorandum of the Office of the Solicitor for the Department of State (Feb. 6, 1930), in Green Haywood Hackworth, 3 Digest of International Law 10 (1942) (concluding that a U.S.-born child was born "subject to the jurisdiction thereof" because her mother did not belong to "any one of the classes of aliens referred to by [Wong Kim Ark] as enjoying immunity from the jurisdiction of the United States" and thus there was "no question" that the mother "would have been subject to prosecution and punishment under the laws of this country" if "she had committed a murder or any other criminal offense" while present here).

The Congress that first codified birthright citizenship understood this well. In 1939, Congress passed a private bill,[13] Priv. L. No. 76-225, 53 Stat. 1529 (1939), cancelling a deportation order for Isabel Perez y Pacios, a Spanish citizen who "fraudulently gained" admission to the United States and then overstayed her temporary admission, Sen. Rep. No. 76-547, at 1 (1939). It did so because she and her unlawfully present husband had "two American-born children," id. at 2, *i.e.*, "native-born citizens of the United States," H.R. Doc No. 77-47 at

[13] A private bill grants relief—here from deportation—to specific individuals. For more examples, see Neuman, Lessons at 7 n.31, 9 n.42.

19 (1941) (recounting the cancelled deportation). The Congressional record brims with similar examples. See, e.g., id. at 83–84 (describing the U.S.-born children of an alien who entered the country by "falsely representing" his purposes, as "United States citizens"); S. Rep. No. 75-1282, at 2 (1937) (recommending relief for an alien "technically guilty of entering the United States on false documents" because deportation would cause hardship for "her child, an American-born citizen"); H.R. Doc. No. 78-92, at 51–52 (1943) (child of stowaways is a "minor citizen child").

In sum, the commercial-transaction and fraudulent-activity exception flouts the plain language of the Fourteenth Amendment and § 1401, conflicts with Supreme Court precedent and longstanding Executive Branch practices, and "runs counter to our nation's 250-year history of citizenship by birth." CASA I, 793 F. Supp. 3d at 697.

* * *

The merits in this case are clear-cut. The Supreme Court has twice confirmed that all children born in this country are U.S. citizens, save only for the small handful who are not subject to U.S. law. The only relevant exception today is for children of parents with full diplomatic immunity—who are excluded from the class. Because EO2 seeks to strip citizenship from class members in violation of the Citizenship Clause and § 1401, Plaintiffs are exceedingly likely to succeed on the merits.

B. Irreparable Harm

For harm to be irreparable, it must be non-speculative, sufficiently imminent, and beyond remediation. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). An actual or prospective violation of a constitutional or statutory right can constitute irreparable injury. See Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013).

"Defendants agree with Plaintiffs on one thing: American citizenship is precious." Opp'n at 25. The Supreme Court concurs as well. See Fedorenko v. United States, 449 U.S. 490, 507 (1981) (describing United States citizenship as a "priceless treasure"); Schneiderman v. United States, 320 U.S. 118, 122 (1943) ("[I]t is safe to assert that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country."). As does this Court. So the Court, like others before it, has "little difficulty concluding that the denial of citizenship status to newborns, even temporarily, constitutes irreparable harm." N.H. Indon. Cmty. Support v. Trump, 765 F. Supp. 3d 102, 111 (D.N.H. 2025), aff'd in relevant part, vacated in part, remanded, 157 F.4th 29 (1st Cir. 2025); see also CASA III, 838 F. Supp. 3d at 520 (collecting cases); Barbara, 790 F. Supp. 3d at 103 (same). Waiting until final judgment is not an option for Plaintiffs and unnamed class members because the "loss of birthright citizenship—even if temporary, and later restored at the conclusion of litigation—has cascading effects that would cut across a young child's life (and the life of that child's family), very likely leaving permanent scars." Doe v. Trump, 766 F. Supp. 3d 266, 285 (D. Mass. 2025).

The preliminary injunction against EO2 in CASA III does not negate Plaintiffs' irreparable harm. For one, not all named Plaintiffs are in the CASA class. For another, while the presence of an overlapping injunction might lead a court to stay its hand in particular cases, courts "routinely grant follow-on injunctions against the Government," even when a separate court in an earlier-filed action "has already provided plaintiffs in the later action with their desired relief." Whitman-Walker Clinic, Inc. v. HHS, 485 F. Supp. 3d 1, 60 (D.D.C. 2020) (collecting cases); see also California v. HHS, 390 F. Supp. 3d 1061, 1065–66 (N.D. Cal. 2019) ("[O]verlapping injunctions appear to be a common outcome of parallel litigation, rather than a reason for the Court to pass on exercising its duty to determine whether litigants are entitled to

relief.”). That is because preliminary injunctions are not final—they “could be modified, limited, or overturned at any time.” CASA I, 793 F. Supp. 3d at 698 (preliminarily enjoining EO1 even though the Barbara court had already granted an identical classwide preliminary injunction). Indeed, Defendants are actively trying to dissolve the CASA preliminary injunction. See CASA v. Trump, No. 25-cv-201 (D. Md.), ECF Nos. 183, 193.

Defendants respond that Plaintiffs’ “undue delay” in filing this suit “militates against a finding of irreparable harm.” Opp’n at 24. Not so. Defendants themselves maintain that no one had standing to sue “prior to the implementation of [EO2] in September 2026.” Opp’n at 11. Within days of Defendants issuing their guidance, Plaintiffs joined the class in Barbara and moved for a preliminary injunction. See Barbara v. Trump, No. 25-cv-244 (D.N.H.), ECF Nos. 90–92. They then promptly filed this suit after the Barbara court indicated their claims “should be brought separately” from that existing litigation. Id. ECF No. 96; Opp’n 24. Plaintiffs therefore diligently sought relief. See Tex. Children’s Hosp. v. Burwell, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (finding diligence even over course of years). Accordingly, the class “would suffer irreparable harm without a preliminary injunction enjoining” EO2. Barbara, 790 F. Supp. 3d at 103.

C. Balance of Harms and Public Interest

The balance of the equities and the public interest tilt decisively in Plaintiffs’ favor. These factors “merge when, as here, the Government is the opposing party.” Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (citation omitted).

It goes without saying that the public interest is always served by having federal agencies follow the Constitution and federal law. See Gordon, 721 F.3d at 653; League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). On the other side of the ledger, Defendants’ claimed

harm is being prevented from enforcing EO2. Opp'n at 24–25. But the Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation omitted); see, e.g., Washington v. Trump, 145 F.4th 1013, 1037 (9th Cir. 2025) (affirming preliminary injunction of EO1 because the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations" (citation omitted)), cert. denied, 146 S. Ct. 2809 (2026). This is especially so here, where the unlawful policy bucks a 250-year-old status quo. See Ams. for Prosperity Found. v. Albence, 191 F.4th 169, 173 (3d Cir. 2026) ("Ordinarily, the balance of equities strongly favors preserving the status quo, not disrupting it.").

Having satisfied all four Winter factors, Plaintiffs are entitled to preliminary injunctive relief.

D. Scope of Injunction

Injunctions must be "narrowly tailored to remedy the specific harm" caused to the parties in the litigation. Neb. Dep't of Health & Human Servs. v. HHS, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted); see CASA, 606 U.S. at 852, 854 (explaining that the "maximum a court can provide" is an injunction that provides "complete relief *to the plaintiffs before the court*"). The need for narrow tailoring, moreover, is particularly important at the preliminary-injunction stage, "where the court has yet finally to resolve the merits of the dispute." U.S. Ass'n of Reptile Keepers, Inc. v. Jewell, 106 F. Supp. 3d 125, 126 (D.D.C. 2015).

That in mind, the Court will preliminarily enjoin the Secretary of Homeland Security; the Secretary of State; the Commissioner of the Social Security Administration; and their agents, servants, employees, attorneys, and any other persons who are in active concert or participation

with them from enforcing EO2 against class members, and from taking any other actions to deny or infringe on the citizenship of class members.[14] The preliminary injunction is narrowly tailored to redress the class's injury: the denial of citizenship guaranteed by the Citizenship Clause and § 1401. And this indivisible remedy will benefit the entire class by preventing Agency Defendants from denying them the right to citizenship by birth. See Wal-Mart Stores, 564 U.S. at 360. Finally, because the class excludes children of ambassadors or those born outside of the United States, nothing in this Memorandum Opinion should be read to cast doubt on the lawfulness of EO2 § 2(b)(i) or § 2(d).

E. Bond

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts have "broad discretion . . . to determine the appropriate amount of an injunction bond." DSE, Inc. v. United States, 169 F.3d 21, 33 (D.C. Cir. 1999). Because Plaintiffs seek to vindicate an important right and the narrowly tailored relief will not expose Defendants to financial loss, the Court will require a nominal bond of $1. See Beatty v. Trump, 834 F. Supp. 3d 41, 103 (D.D.C. 2026) (Cooper, J.) (imposing nominal bond of $1); Hennepin County v. HHS, No. 26-cv-2460 (CRC), 2026 WL 2426300, at *27 (D.D.C. Aug. 19, 2026) (same); Barbara, 790 F. Supp. 3d at 104 (same).

---

[14] This Court has inherent equitable authority to enjoin violations of federal law by federal officers. See Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 326–27 (2015). This includes both violations of the Constitution, see Axon Enter., Inc. v. FCC, 598 U.S. 175, 180 (2023), and statutory violations, see Trump v. Cook, 609 U.S. 528, 549 n.2 (2026).

F. Stay

Finally, Defendants request a stay pending appeal. Opp'n at 25–26. The stay factors mirror the preliminary injunction factors. See Nken, 556 U.S. at 434. But it is Plaintiffs—not Defendants—who are likely to succeed on the merits. Plus, the equities strongly disfavor a stay. So the "extraordinary remedy" of a stay pending appeal is not warranted. M.M.V. v. Barr, 459 F. Supp. 3d 1, 4 (D.D.C. 2020).

## V. Conclusion

"Citizenship is man's basic right for it is nothing less than the right to have rights." Perez v. Brownell, 356 U.S. 44, 64 (1958) (Warren, C.J., dissenting). The Citizenship Clause promises citizenship to practically all children born in the United States. Earlier this year, the Supreme Court kept that promise by striking down EO1. This Court does so again today by enjoining EO2's application as to the certified class. For the foregoing reasons, the Court will grant Plaintiffs' Motion for Class Certification and Motion for a Classwide Preliminary Injunction. A separate Order shall accompany this memorandum opinion.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: November 25, 2026